In re JOE FLYNN RARE COINS, INC., Debtor.

Joseph M. FLYNN, Suz–Anne M. Flynn, For the Use and Benefit of Robert A. FOTHERGILL, Trustee, and the Unsecured Creditors of the Bankruptcy Estate of Joe Flynn Rare Coins, Inc., Plaintiffs,

v.

MIDAMERICAN BANK AND TRUST COMPANY, Defendant.

Bankruptcy No. 84–20746–7.
Adv. No. 86–0160.

United States Bankruptcy Court, D. Kansas.

Jan. 19, 1988.

Gene A. DeLeve and Jerald S. Enslein, of Berman, DeLeve, Kuchan & Chapman, Kansas City, Mo., Howard S. Levitan, Prairie Village, Kan., for plaintiffs Flynns.

Douglas Lancaster and Michael D. Strohbehn, of Linde Thomson Fairchild Langworthy Kohn & Van Dyke, P.C., Overland Park, Kan., for defendant Bank.

Robert A. Fothergill, Kansas City, Kan., trustee.

Eric C. Rajala, Overland Park, Kan., for trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This is an adversary proceeding brought by Joseph M. Flynn and Suz–Anne M. Flynn ("Flynns" or "plaintiffs") for the use and benefit of Robert A. Fothergill, Trustee of the bankruptcy estate of Joe Flynn Rare Coins, Inc. ("Coin Company") to recover alleged preferential transfers to and pre-petition set-offs by MidAmerican Bank and Trust Company ("Bank" or "MidAmerican Bank" or "Defendant") pursuant to §§ 547(b), 550, and 553 of Title 11 of the United States Code. This matter came for hearing on August 28, 1987, on the defendant Bank's motion for summary judgment on both counts. The Flynns appeared by and through counsel, Gene A. DeLeve and Jerald S. Enslein. The Bank appeared by and through its counsel, Douglas Lancaster and Michael D. Strohbehn.

According to Rule 56(c) of the Federal Rules of Civil Procedure (Bankruptcy Rule 7056(c)), summary judgment is proper only when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Under this rule, the initial burden is on the moving party (the Bank) to show the Court "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). This can be done when the moving party identifies those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at ——, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. Once the moving party has met these requirements, the burden then shifts to the party resisting the motion. The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). Summary judgment is appropriate when the non-moving party cannot set forth specific facts supporting the essential elements of his or her claim. *Celotex*, 477 U.S. at ——, 106 S.Ct. at 2552, 91 L.Ed.2d at 273. In considering a motion for summary judgment, however, the court must look at the record in the light most favorable to the non-moving party. *Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981).

In the present case, the Bank has alleged 33 numbered facts as uncontroverted in support of summary judgment. The Bank supports each of these facts by affidavits, prior sworn testimony, depositions, responses to discovery, or documentary evidence in the file. The facts are as follows:

1. During the period from February 1, 1983, to March 25, 1983, Coin Company requested and obtained four (4) loans from Bank amounting in the aggregate to $1,500,000.00. Said loans are more fully described as follows:

| Loan No. | Date | Amount |
| --- | --- | --- |
| No. 9193 | February 1, 1983 | 400,000.00 |
| No. 9287 | February 22, 1983 | 325,000.00 |
| No. 9325 | March 1, 1983 | 600,000.00 |
| No. 9451 | March 25, 1983 | 175,000.00 |

[Amended Complaint, March 12, 1987, and Answer to Amended Complaint, March 26, 1987.]

2. As security for the above-mentioned loans, Coin Company granted to Bank a security interest in its inventory and proceeds. [Defendant's Request for Admission No. 3, Admitted]

3. That at all times during the period from February 1, 1983 to August 24, 1984, the Bank had a senior-perfected security interest in the Coin Company's inventory and proceeds. [Defendant's Request for Admission No. 6, Admitted and Journal Entry of Judgment, April 2, 1985, Adversary Proceeding No. 84–0131]

4. Each of the Security Agreements executed by the Coin Company in favor of the Bank provides, in part:

Any deposits or other sum at any time credited by or due from the secured party to any maker, endorser or guarantor hereof and any securities or other property of any maker, endorser or guarantor hereof in the possession of the secured party may at all times be held and treated as collateral security for the payment of obligations not existing or hereafter arising. The secured may apply or set-off such deposits or other sums against said liabilities at any time.

[Joseph Flynn Deposition, 6/12/87, Deposition Exhibits 11, 12 and 13]

5. That plaintiffs herein, Joseph M. Flynn and Suz–Anne Flynn, and Barbara Wirth Flynn, for valuable consideration received, executed and delivered to the Bank their written guaranty of all present and future debts of the Coin Company to Bank. [Defendant's Request for Admission No. 7 to Plaintiffs, Admitted]

6. That each of the Guaranty Agreements in favor of Bank from Joseph M. Flynn, Suz–Anne Flynn and Barbara Wirth Flynn guaranteeing the Coin Company's debt to Bank provides in part:

"The undersigned is your debtor for all indebtednesses for which this Guaranty is made and you shall also at all times have:

(1) A prior lien on any stocks, bonds and other securities or the undersigned at any time in your possession and the same shall be held, administered and disposed of as collateral to any such indebtedness of the Borrower;

(2) The right of set-off against any deposit account of the undersigned at any time before, at or after maturity.

[Defendant's Request for Admission to Plaintiffs' Nos. 7 and 8 and Exhibits A, B and C attached to said Requests]

7. On May 26, 1984, the aggregate amount of Coin Company's unpaid loans to the Bank, including principal and interest was $1,433,976.00. [Plaintiffs' Responses to Defendant's Request for Admissions No. 9, May 6, 1987, No. 9]

8. On August 24, 1984, the aggregate amount of Coin Company's unpaid loans to the Bank, including principal and interest was $1,379,133.18. [Amended Complaint, March 12, 1987 and Answer to Amended Complaint, March 26, 1987]

9. The maturity date of each of the four loans from the Bank to the Coin Company were extended from time to time and it was the normal practice of the Coin Company to pay the interest on the loans in accordance with the terms of said Notes. [Defendant's Request for Admission No. 10, Admitted by Plaintiff]

10. On May 26, 1984, the deposit accounts of Coin Company at the Bank contained the sum of $110,279.00. [Plaintiffs' Responses to Defendant's Request for Admission No. 11, May 6, 1987]

11. On August 24, 1984, the deposit accounts of Coin Company at the Bank contained the sum of $95,476.81. [Plaintiffs' Responses to Defendant's Request for Admissions No. 12, May 6, 1987]

12. On August 24, 1984, and prior to the filing of Coin Company's Petition for Relief, the Bank set-off $125,424.72 from deposit accounts of individual guarantors of the Coin Company debt to Bank, and applied said sum to principal or interest on said debt. [Plaintiffs' Responses to Defendant's Request for Admission No. 22, May 6, 1987]

13. All proceeds from the sale of Coin Company's inventory during the period May 26, 1984 through August 24, 1984, were deposited into Coin Company's deposit accounts at the Bank. [Plaintiffs' Responses to Defendant's Request for Admission No. 29, May 6, 1987]

14. Between May 26, 1984 and August 24, 1984, there was no material change in the value of Coin Company's inventory as a result of purchases or sales or changes in market condition. [Plaintiffs' Answers to Bank's First Interrogatories to Plaintiffs, No. 2(A)]

15. Schedule B-2 of Coin Company's Statement of Financial Affairs filed October 25, 1984 in Case No. 84–20746 states the "market value" of the Coin Company's inventory was $2,083,000.00 as of August 24, 1984. [Plaintiffs' Responses to Defendant's Request for Admissions No. 21, May 6, 1987]

16. Joseph M. Flynn testified on September 11, 1984, that based on his "experience in the rare coin business" his opinion as to "the fair market value of [the Coin Company's] inventory at the present time" was between "a million eight and two million dollars." [Case No. 84–20746, Transcript of Proceedings, September 11, 1984, p. 39, lines 1–11; Id., at p. 54, lines 2–10]

17. Joseph M. Flynn testified on September 11, 1984, that based on his "experience in the rare coin business" his opinion as to the "liquidation value" of the Coin Company's inventory was based upon "... an ordinary sale somewhere between a million three and a million five." [Case No. 84–20746, Transcript of Proceedings, September 11, 1984, p. 39, lines 1–15]

18. Joseph M. Flynn further testified on September 11, 1984, that based on his "experience in the rare coin business" his opin-

ion as to the "retail value" of the Coin Company's inventory was in "... in excess of two million dollars. Probably two to two one, somewhere in that area." [Case No. 84–20746, Transcript of Proceedings, September 11, 1984, p. 60, lines 1–16]

19. Steve Ivy testified on September 12, 1984, that based upon his expert opinion, the Coin Company's inventory if "sold over time at wholesale," would bring approximately $1,350,000.00. [Case No. 84–20746, Transcript of Proceedings, September 12, 1984, p. 135, line 13–22]

20. Steve Ivy testified on September 12, 1984, that based upon his expert opinion, the Coin Company's inventory if sold at "retail" would bring $1,700,000–$2,000,000. [Case No. 84–20746, Transcript of Proceedings, September 12, 1984, p. 128, lines 3–12]

21. On April 16, 1985, the Bank and Plaintiffs herein, Joseph M. Flynn and Suz-Anne M. Flynn, entered into a "Mutual Release Agreement" which provides in part "Flynn (Joseph M. Flynn and Suz-Anne M. Flynn) hereby releases and forever discharges MidAmerican of and from any and all claims and causes of action of any nature whatsoever without limitation." [Plaintiffs' Response to Defendant's Request for Admission No. 17 and Exhibit "F" attached to Defendant's Request for Admission]

22. On February 14, 1984, the Coin Company delivered its Financial Statement to the Bank for the period ending December 31, 1983. The Financial Statement states the value of the Coin Company's inventory as of December 31, 1983, was $2,588,630. [Plaintiffs' Responses to Defendant's Request for Admission No. 19 and Exhibit "G" attached to Defendant's Request for Admission]

23. The Financial Statement prepared by the Coin Company for the period ending June 30, 1984, states the value of the Coin Company's inventory as of June 30, 1984, was $1,895,308. [Napshin Deposition Exhibit No. 1—6/9/87]

24. In addition to the Coin Company's inventory individually and physically appraised over the Labor Day weekend (Sep-

tember 3, 1984), there was an additional $27,000 in coins out on consignment to third parties. [September 11, 1984 Transcript, pp. 74, 75 and Exhibit "1", Case No. 84–20746]

25. The Coin Company loans at MidAmerican Bank were reviewed by the Bank's loan committee on May 31, 1984. [Bogatie Deposition Exhibit No. 2—1/24/85 and Flynn Deposition Exhibit No. 18 6/12/87]

26. To induce the Bank to extend the Coin Company's loans, the Coin Company delivered to the Bank its appraised value of its inventory as of May 29, 1984, which represented the inventory value at that time to be $2,212,933. [See Bogatie Deposition Exhibit No. 2—1/24/85 and Flynn Deposition Exhibit No. 18 6/12/87. Also see Flynn Deposition—6/12/87, Exhibit No. 22 and testimony at Page 32, Lines 7–17]

27. Marshall Napshin is a certified public accountant who prepared the Coin Company's financial statements for the periods ending 12/31/83 and 12/30/84. [See Napshin Deposition—6/9/87—p. 4, lines 24–25, p. 5, lines 1–25, and p. 6, lines 1–16, and Joseph Flynn Deposition—6/12/87—p. 12, lines 2–16 and p. 25, lines 11–13]

28. Marshall Napshin's valuation of the inventory which appears in the 12/31/83 and 6/30/84 Coin Company financial statements was obtained from Joseph Flynn, President of the Coin Company. [Napshin Deposition—6/9/87, p. 8, lines 2–9, and Flynn Deposition 6/12/87, p. 20, lines 15–19]

29. The Coin Company's certified public accountant instructed Joseph Flynn to value the Coin Company's inventory for purposes of preparing the 12/31/83 and 6/30/84 financial statements at "cost or market, whichever was lower." [Napshin Deposition—6/9/87, p. 12, lines 5–25, p. 13, line 1, and Flynn Deposition—6/12/87, p. 20, lines 15–19]

30. On August 2, 1984, the Twin City State Bank had physical possession of Coin Company inventory with a "market value" of $940,820. [Flynn Deposition—6/12/87, Exhibit 23, and Testimony at p. 32, lines 18–22]

31. On August 14, 1984, the MidAmerican Bank and Trust Company held in its possession Coin Company inventory with a "market value" of $989,595. [See Flynn Deposition—6/12/87, Exhibit No. 24, Testimony at p. 32, line 25, and p. 33, lines 1–22]

32. All Coin Company inventory identified by Flynn Deposition Exhibits 23 and 24 remained in the possession of MidAmerican Bank and Trust Company and Twin City Bank at the date the Coin Company filed its bankruptcy petition on August 24, 1984. [Flynn Deposition 6/12/87, p. 37, lines 19–25 and p. 38, lines 1–4]

33. The "market value" of the Coin Company's inventory indicated on the Flynn Deposition Exhibits 23 (8/2/84) and 24 (8/14/84) contemplated the Coin Company to be "on-going." [Flynn Deposition—6/12/87, p. 46, lines 22–25; p. 47, lines 1–25; and p. 48, lines 1–6]

The plaintiffs, on the other hand, contend that there is a genuine issue with respect to the following material facts: (i) whether the Coin Company was insolvent during the 90 days prior to August 24, 1987, as required by section 547; (ii) whether the Bank was a fully secured creditor during the 90 days prior to August 24, 1987, as required by section 547; (iii) whether payments made by the Bank during the 90–day period enabled it to receive more than it would in chapter 7, as required by section 547; and (iv) whether the Bank improved its position as an unsecured creditor by exercising its right of setoff as required by section 553. In support of their position opposing the motion for summary judgment, the plaintiffs alleged 13 sets of facts. The plaintiffs support the facts by affidavits, prior sworn testimony in this bankruptcy case, depositions, responses to discovery, or other documents on file. The facts are as follows:

1. Over the Labor Day, 1984 holiday weekend, Steve Ivy, an experienced coin dealer and appraiser, examined Coin Company's inventory and appraised it at the request of MidAmerican Bank. [Transcript of Proceedings, September 11–13, 1984, pp. 118–127] Mr. Ivy testified that there were four ways to market or sell a coin dealer's

inventory: (i) at wholesale to other dealers over a period of time; (ii) in bulk to another dealer; (iii) at auction; and (iv) at retail. [Transcript, pp. 124–125] A "wholesale sale" is when one dealer sells to another dealer. In response to Mr. Lancaster's request that he "explain to the Court what your opinion is as to the present value of the inventory," Mr. Ivy testified "if it was sold at auction today, I feel it would bring approximately a million dollars. If it was sold over time at wholesale, I feel it would bring approximately a million three hundred fifty thousand dollars, approximately. If it was retailed, it would be somewhat above that, between one million seven hundred thousand and two million dollars would be retail. It would depend on the retail spread." If it was sold in bulk to a dealer, it was Mr. Ivy's opinion that the entire inventory would bring it within the seven hundred thousand or eight hundred thousand dollar range. [Transcript, p. 128]. Mr. Ivy further testified that it would take "probably twelve months or maybe in excess of that" to sell the inventory at wholesale in order to realize the million three hundred fifty thousand dollar wholesale value and that without wholesaling any coins it would take several years to retail the entire inventory. [Transcript, pp. 128–129] Mr. Ivy also testified that an auctioneer's fee would be six per cent [Transcript, p. 151], that it is more expensive to retail than to wholesale, and more expensive to wholesale than to sell at auction. [Transcript, p. 129] Mr. Ivy testified that in his opinion, considering the expenses and costs, in most cases no more would be realized from retailing a dealer's inventory than wholesaling it. [Transcript, pg. 131]

2. Joseph M. Flynn is an experienced coin dealer with more than 20 years experience in buying and selling rare coins. [Transcript, pgs. 8–9] Mr. Flynn testified on September 11, 1984, that if the Coin Company's inventory was sold at wholesale, its value would be somewhere between $1.3 million and $1.5 million. [Transcript, pp. 39, 40, 61]

3. Mr. Flynn further testified on September 11, 1984, that the expenses of operating Coin Company's business for the first six months of 1984 amounted to $135,750, or an average of $22,625 per month. He estimated that Coin Company's operating expenses for the fourth quarter of 1984 would be $25,625 a month, or approximately $3,000 a month higher to cover the increased cost of advertising and travel during October, November, and December.· [Transcript, pgs. 20, 21, 24; deposition Exhibit no. 3] For the twelve months that Mr. Ivy testified would be required to sell the inventory at wholesale the related expenses, based on Mr. Flynn's estimate of future operating costs and actual operating costs for the first half of 1984, would be between $271,500 and $307,500. Based on Mr. Ivy's testimony that the wholesale value of the Coin Company inventory, before expenses, was approximately $1,350,000, the net amount realized from disposing of the inventory at wholesale would be $1,042,500 to $1,078,500.

4. Kevin Lipton, a coin dealer from Beverly Hills, California, examined the Coin Company's coins at MidAmerican Bank and Twin City State Bank. He valued these coins at $685,090. [Flynn deposition, pp. 36–39, deposition Exhibit no. 26] He did not inspect or value the store inventory or the inventory then held by the trustee, which Mr. Ivy valued at $112,914.

5. On April 4, 1985, the Court entered an Order authorizing the trustee to abandon the Coin Company's inventory to MidAmerican Bank and Twin City State Bank.

6. On April 16, 1985, MidAmerican Bank and Twin City State Bank sold the entire inventory of Coin Company to Rare Coin Company of America, Inc., a buyer produced by Mr. Flynn, for the sum of $1,000,000, no higher or better private bid having been received by the Banks. [Deleve Affidavit, Exhibit no. 1]

7. On April 16, 1985, Joseph M. Flynn; Suz–Anne M. Flynn; Jack Brier, Kansas Secretary of State; MidAmerican Bank; and Twin City State Bank entered into a "Settlement Agreement." The Settlement Agreement contains the following recitals:

"Whereas, the Flynns have procured a buyer for the inventory of the Coin Company and propose that the Banks sell said inventory to said Buyer for a total consideration to be received by the Banks of $1,000,000 ..." and

"Whereas, the Banks have reason to believe that the sale of the inventory of the Coin Company under current market conditions will produce substantially less than $1,000,000 and desire to accept the offer to purchase the coins for $1,000,000 on the terms and conditions set out herein;" [Deleve Affidavit, Exhibit no. 2]

The "Settlement Agreement" and the "Mutual Release Agreement," to which Mid–American Bank and plaintiffs Joseph M. Flynn and Suz–Anne M. Flynn are parties, were entered into contemporaneously with each other. By the terms of the Settlement Agreement the Flynns and MidAmerican agreed to execute and deliver to each other "a full mutual release of all claims of every kind and character which they may have against each other, arising out of or in any way connected with the events described herein;". The "Mutual Release Agreement" executed by MidAmerican Bank and the Flynns contains the statement that "Flynn hereby release and forever discharges MidAmerican of and from any and all claims and causes of action of any nature whatsoever without limitation." [MidAmerican Bank Appendix B, Ex. F]

8. The trustee of the Coin Company was not a party to the Settlement Agreement. Paragraph no. 3 of that Agreement provides as follows:

"If the Trustee, within 45 days from the date hereof, executes a release on behalf of the Coin Company releasing claims of every kind and nature which the Coin Company has or may claim to have against the Flynns, Twin City or Brier, then Twin City will, in consideration thereof, waive any claim for deficiency they may have against the bankruptcy estate of the Coin Company following the sale of the coins as herein provided."

In settlement discussions between counsel, the potential claims of the trustee against the Banks were discussed. On April 9, 1985, MidAmerican Bank's attorney advised Coin Company's attorney that the Bank had not yet decided whether it would be willing to release its deficiency claim upon the same basis as was proposed for Twin City State Bank in paragraph no. 3 of the Settlement Agreement. The trustee was not a party to the Settlement Agreement or Mutual Release Agreement, and his claims as trustee against the Banks or the other parties to those Agreements were not intended to be released or affected thereby. At no time did the trustee receive any consideration for releasing any claims against the Banks, nor did the trustee recommend or request Bankruptcy Court approval of any release or settlement. No Bankruptcy Court approval of any release or settlement of claims of the trustee against MidAmerican Bank was ever given. [DeLeve Affidavit, Exhibit no. 3]

9. The monies deposited in Coin Company's checking accounts at MidAmerican Bank during the 90–day period preceding August 24, 1984, included sales, federal income and social security taxes withheld from Coin Company employees in which MidAmerican Bank had no security interest. [Flynn deposition, Exhibit nos. 7, 8 and 9]

10. During the 90–day period between May 26, 1984, and August 24, 1984, Coin Company purchased rare coins and bullion for resale at a total cost of $622,534.80. During the same 90–day period, Coin Company sold coins and bullion from inventory for a total selling price of $669,523.41. Coin Company's cost of the coins and bullion sold was $580,494.93. During said 90–day period, the value of Coin Company's inventory, at cost, increased by $42,039.87. [Flynn Affidavit, Flynn deposition, Exhibit nos. 7, 8 and 9]

11. As of June 30, 1984, Coin Company's balance sheet reflected a receivable from Premier Quarter Horses, Inc. in the amount of $434,064. This claim was not collectible in full or in substantial part. On March 22, 1985, the trustee of Coin Company filed an involuntary petition against Premier Quarter Horses, Inc. After investi-

gating the assets and liabilities of Premier Quarter Horses, Inc., the trustee agreed to accept $24,052.13 in full satisfaction of Coin Company's claim against Premier Quarter Horses, Inc. The settlement was approved by order of this Court on August 12, 1985. [DeLeve Affidavit] The value of this asset is overstated in Coin Company's June 30, 1984 balance sheet by $410,000.

12. Immediately before MidAmerican Bank set off the balance of the checking accounts of Coin Company, Joseph M. Flynn, Suz–Anne M. Flynn and Barbara Wirth Flynn and applied the balances of said accounts in partial payment of principal and/or interest on MidAmerican Bank loans to Coin Company, the total principal amounts of said loans was $1,350,000, and unmatured interest calculated to August 24, 1984, amounted to $29,133.18. [Amended Complaint, paragraph no. 15; Answer to Amended Complaint, paragraph no. 26]

13. On May 26, 1984, the aggregate amount of Coin Company's unpaid loans (principal and interest) was $1,433,976. [Amended Complaint, paragraph no. 7; Answer to Amended Complaint, paragraph no. 7]

### ANALYSIS OF THE SUMMARY JUDGMENT MOTION

This is an adversary proceeding against MidAmerican Bank ("MidAmerican Bank" or "Bank" or "defendants") brought by Joseph M. Flynn and Suz–Anne M. Flynn ("Flynns" or "plaintiffs") for the use and benefit of Robert A. Fothergill, Trustee of the bankruptcy estate of Joe Flynn Rare Coins, Inc. ("Coin Company"). In Count I, the plaintiffs seek to avoid and recover preferential payments pursuant to sections 547 and 550 of the Code. The plaintiffs allege that the Bank substantially improved its secured position in the debtor's inventory and accounts receivables within 90 days prior to the filing of the petition. The plaintiffs allege that the improved amount is recoverable as a preference. See 11 U.S.C. § 547(c)(5). In Count II, the plaintiffs seek to recover monies set off by the Bank from the debtors' bank accounts as voidable setoffs under sections 550 and 553. By orders entered on December 24, 1986, and March 9, 1987, the Court authorized the plaintiffs to file and prosecute this adversary proceeding against the Bank on behalf of the trustee and creditors of this estate.

The defendant Bank moves for summary judgment on both Count I and Count II. As to Count I, the Bank contends that, based upon its uncontroverted facts, it is entitled to summary judgment for the following reasons: (a) the Coin Company was not insolvent during the 90–day period prior to August 24, 1984, as required by section 547(b)(3); (b) the Bank was fully secured, and therefore, did not receive more than it would have received if the case were under chapter 7 of the Code as required by section 547(b)(5); and (c) the plaintiffs Joseph M. Flynn and Suz–Anne M. Flynn are barred from prosecution of this action by the terms of their April 16, 1985 Mutual Release Agreement with the Bank. As to Count II, the Bank contends that it is entitled to summary judgment for the following reasons: (a) again, the Bank's loans to the Coin Company were at all times fully secured, and therefore, there never was any "insufficiency" as that term is used in section 553(b)(1) of the Code; (b) the Coin Company's deposit accounts contained all the proceeds from the sale of its inventory in which the Bank held a valid, senior, perfected security interest, and therefore, the Bank was entitled to the funds; and (c) the Mutual Release Agreement also bars the prosecution of this Count.

In response to the motion for summary judgment on Count I, the plaintiffs contend that the evidence shows, if not conclusively, then sufficiently to raise genuine issues of fact, that the Coin Company was insolvent during the 90–day period and that the Bank was an undersecured creditor. Furthermore, the plaintiffs contend that the Mutual Release Agreement only goes toward releasing the Bank from claims by the Flynns personally, not by the Flynns on behalf of the trustee. As to Count II, the plaintiffs contend there is a genuine issue

as to whether the Bank was undersecured and, if so, to what extent.

After reading the briefs, hearing oral arguments, and researching the law, this Court finds that much of the arguments overlap and are based on the same facts which are extremely complicated and intertwined. Therefore, for the sake of simplicity, this Court will analyze each Count and each argument under each Count separately.

## A. COUNT I—PREFERENTIAL TRANSFER UNDER SECTION 547(b).

### 1. *Insolvency Requirement of section 547(b)(3)*

■ For a transfer to be avoidable under section 547 it must be made while the debtor was insolvent. *See* 11 U.S.C. § 547(b)(3). Section 101(31)(A) provides that "insolvent" means:

(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title;

In short, a "balance sheet" test determines insolvency. The debtor is insolvent when its liabilities exceed its assets at a fair valuation. *See Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 577 (1st Cir.1980). *See also* 4 Collier on Bankruptcy ¶ 547.06 (15th ed. 1988).

In the present case, the debts or the liability side of the balance sheet test is not in question. There is an actual Coin Company balance sheet dated June 30, 1984, prepared by Marshall Napshin, the Coin Company's accountant. This June 30, 1984 balance sheet was prepared only five days after the first alleged preferential transfer and only 53 days before the last alleged preferential transfer and just 56 days before the petition was filed. The balance sheet shows total liabilities in the amount of $2,141,445.00. (The balance sheet also shows total assets of $2,416,695.00, which is being questioned).

The problem arises in this case in determining the asset side of the balance sheet at a "fair valuation" as required by section 547(b)(3). What standard should this Court use to value the assets, primarily merchandise inventory, of the Coin Company for purposes of determining insolvency under section 547(b)(3)? Does "fair valuation" mean by a retail sale, wholesale over time to other dealers, a bulk wholesale to another dealer, or a forced sale value?

■ Collier on Bankruptcy provides an explanation of the standards the court should use in determining the "fair valuation" of the debtor's property. *See* 2 Collier on Bankruptcy ¶ 101.26[4] (15th ed. 1988). The gist of the explanation is that fair value does not mean the amount the property would bring in the worst circumstances or in the best, but the amount it would bring if the debtor took a reasonable time to collect its debts and sell its property. For example, a forced sale price is not fair value though it may be used as evidence on the question of fair value. Likewise, the fair value of saleable assets is not what they would sell for in the slow process of the debtor's trade as if the debtor were continuing business unhampered. The general idea of fair value is the amount of money the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonably prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts. *In re Fassnacht & Sons, Inc.*, 45 B.R. 209 (Bankr.E.D.Tenn.1984). *See also, Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985).

In support of its motion for summary judgment on the ground that the debtor was solvent, the Bank first relies on the debtor's actual balance sheets of December 31, 1983, and June 30, 1984, prepared by Coin Company's accountant, Marshall Napshin. Both balance sheets published by the Coin Company and delivered to its

creditors establish that the Coin Company's assets substantially exceeded its debts. For example, the June 30, 1984 balance sheet shows total assets of $2,416,695.00, substantially above total liabilities of $2,141,445.00. The total asset figure of $2,416,695.00 includes: (a) cash of $31,-398.00; (b) money market account of $25,-000.00; (c) accounts receivable of $9,269.00; (d) merchandise inventory of $1,895,308.00; (e) other current assets of $4,757.00; (f) fixed assets less depreciation of $16,899.00; and (g) loans to stockholders and related entities (a receivable from Premier Quarter Horses, Inc.) of $434,064.00.

To buttress the financial information in the balance sheet, especially the primary asset of merchandise inventory, the Bank has set forth a deluge of facts. First, Marshall Napshin, the Coin Company's accountant, has stated in a deposition that he obtained the figures from Joseph Flynn. He instructed Joseph Flynn to value the Coin Company's inventory for purposes of preparing the 12/1/83 and 6/30/84 financial statements at "cost or market, whichever was lower." In addition, this Court heard three days of testimony at the cash collateral hearing on September 11, 12, and 13, by two experts as to the value of the debtor's inventory as of the date of petition. Joseph M. Flynn testified that the "fair market value" was between $1,800,-000.00 and $2,000,000.00; that the liquidation value based on an ordinary sale was between $1,300,000.00 and $1,500,000.00. Steve Ivy testified that based on his expert opinion the inventory if "sold over time at wholesale" would bring $1,350,000.00; and if sold at "retail" it would bring between $1,700,000.00 and $2,000,000.00.

On the other hand, the plaintiffs in opposition to the summary judgment have come forward with sufficient evidence to rebut the Bank's evidence for purposes of summary judgment. The plaintiffs first attack the validity of the June 30, 1984 balance sheet. The plaintiffs claim that two major assets are substantially over-valued: the merchandise inventory and the receivable from Premier Quarter Horses, Inc. The plaintiffs point out that the inventory was actually sold back on April 16, 1985, by the Bank to Rare Coin Company of America, Inc. for only $1,000,000.00. The plaintiffs also point out that Steve Ivy, the Bank's expert at the cash collateral hearing, testified that the "wholesale value" of $1,350,-000.00 was before taking into account the expenses that would be incurred in selling to other dealers over at least a 12–month period. Joseph Flynn estimated the expenses to be between $271,000.00 and $307,500.00. In addition, the plaintiffs point out that hindsight has shown that the $434,064.00 receivable from Premier Quarter Horses was only worth $24,052.13. That is the amount the trustee agreed to accept after Premier itself was forced into bankruptcy.

■ After reviewing the evidence on both sides of the issue, this Court must agree with plaintiffs and find that they have demonstrated the existence of a genuine issue of material fact as to the debtor's insolvency. The Court reaches this conclusion keeping in mind that, in considering a motion for summary judgment, the Court must look at the record in the light most favorable to the non-moving party. *See Lindley v. Amoco Production Co.*, 639 F.2d 671, 672 (10th Cir.1981). The Court finds that the plaintiffs have set forth sufficient specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986). The Court further finds that the plaintiffs have shown that there are any number of subsidiary fact questions still open: What is the proper method for selling or collecting the type of property involved based on the Collier analysis? What is a reasonable time for converting the property to cash? What costs and expenses will be involved? After reviewing all the evidence and the pleadings to date, this Court still is unable to answer these questions.

2. *Undersecured Creditor Requirement of Section 547(b)(5)*

The Bank also moves for summary judgment on the ground that it was a fully secured creditor during the 90–day period prior to bankruptcy, and, therefore, the

transfers to the Bank did not enable it to receive more than it would have received in a chapter 7 liquidation as required by section 547(b)(5). The plaintiffs of course claim just the opposite and argue that the facts before this Court demonstrate that there is at least a genuine issue of material fact.

Section 547(b)(5) is a central element of a preference action because it requires a comparison between what the creditor actually received and what it would have received under the chapter 7 distribution provisions of the Code. Specifically, the trustee must prove that the creditor received more than it would if the case were a chapter 7 liquidation case, the transfer had not been made, and the creditor received payment of the debt to the extent provided by the provisions of the Code. 4 Collier on Bankruptcy ¶ 547.08 (15th ed. 1988). The purpose of this provision is to discourage creditors within a short period before bankruptcy "from racing to the courthouse to dismember the debtor during his slide into bankruptcy" and to ensure that all creditors are treated equally.

■ Generally, a trustee cannot recover a prepetition transfer or payment within 90 days to a "fully secured creditor" because the transfer only reduces secured debt and does not enable the secured party to receive more than in a chapter 7 liquidation. *See In re Fitzgerald,* 49 B.R. 62, 65 (Bankr.D.Mass.1985); and *In re Derritt,* 20 B.R. 476 (Bankr.N.D.Ga.1982). However, when the value of the secured party's collateral is less than the amount of the debt, a transfer to the undersecured party depletes the estate and is considered preferential. *In re Fitzgerald,* 49 B.R. at 65.

In the present case, the aggregate amount of the Coin Company's unpaid loans to the Bank on May 26, 1984 (90 days prior to bankruptcy) was $1,433,976.00. The aggregate amount of the Coin Company's unpaid loans to the Bank on August 24, 1984 (date of petition) was $1,379,-133.18.

The other side of the question, the value of the Bank's collateral, poses more of a problem. What standard should this Court use to value the collateral? The Bank, in support of its motion for summary judgment, urges this Court to value the property 90 days before bankruptcy on a "going-concern" basis. The plaintiffs, however, argue that the much lower "liquidation value" is the proper method.

Section 506(a) of the Code governs the valuation of secured claims and provides only general principles for the Court to follow in determining what standard of valuation is proper in calculating the value of a creditor's secured claim. Section 506(a) states that "[s]uch value shall be determined in light of the purpose of the valuation of the proposed disposition and use of such property, and in conjunction with any hearing on such disposition or use or on a plan effecting such creditors interest." The legislative comments to this section do not give any further guidance except to reiterate that the courts are to determine value on a case-by-case basis, taking into account the facts of each case and the competing interest in the case. *In re Lackow Brothers, Inc.,* 752 F.2d 1529, 1532 (11th Cir.1985) *(citing* H.R.Rep. No. 595, 95th Cong., 1st Sess. 356 (1977) *(reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6312)).

The Bank argues that, after taking into account the facts and competing interest in this case, the proper standard is an "ongoing concern" valuation standard. In support of an "ongoing concern" definition of value, the Bank relies on three cases: *Lackow Brothers, supra; In re Frost,* 47 B.R. 961 (D.Kan.1985); and *In re Utility Stationery Stores, Inc.,* 12 B.R. 170 (Bankr.N.D.Ill.1981).

This Court finds *Lackow Brothers* and *Frost* readily distinguishable. In *Lackow Brothers,* the only evidence of value before the court was an ongoing concern value. As the Eleventh Circuit stated: "The only evidence in the record of value for the ninetieth day prior to the filing of the bankruptcy is the ongoing concern value; therefore, this is the *only* standard of valuation that can be applied to determine if Creditor's position improved ..." *Lackow Brothers,* 752 F.2d at 1532. The ongoing

concern value is *not* the *only* evidence before this Court. For another case distinguishing *Lackow Brothers* on this same ground, *see e.g., Ebbler Furniture and Appliances, Inc.,* 804 F.2d 87, 90 (7th Cir. 1986).

The *Frost* case is also off point. *Frost* does not even address the issue of valuing collateral under section 547(b)(5). Rather, *Frost* is a chapter 13 case addressing the issue of valuing collateral to determine the amount of secured claim when the debtor intends to keep and use the collateral. It has been successfully argued that the definition of "value" in other parts of the Code is not useful for section 547 purposes. *See Ebbler Furniture,* 804 F.2d at 90 (*citing* N. Cohen, *"Value" Judgments: Account Receivable Financing and Voidable Preferences Under the New Bankruptcy Code,* 66 Minn.L.Rev. 639, 653 (1982)).

As for the Bank's authority of *Utility Stationery,* out of the Bankruptcy Court for the Northern District of Illinois, this Court is not persuaded by the reasoning, or lack thereof, in that case. *Utility Stationery* fails to provide any explanation other than citing to old Act cases of why "ongoing concern" value is the proper standard under section 547(b)(5). Furthermore, this Court does not believe that *Utility Stationery* is strictly followed by the bankruptcy courts in Illinois. The Seventh Circuit, of which the Bankruptcy Court, Northern District of Illinois, belongs, has adopted a more individualized case-by-case approach to find that in a case involving inventory that a "wholesale" or "cost" standard is proper. *See Ebbler Furniture, supra.* This Court finds *Ebbler Furniture* to be both well reasoned and persuasive.

In *Ebbler Furniture,* the Seventh Circuit approved a bankruptcy court's use of the cost of inventory and accounts receivable in valuing a bank's security for purposes of section 547(b) and (c)(5). In defining value at "cost" or "wholesale", the Circuit Court used an after-the-fact approach proposed by Professor Cohen. *Id.* at 90 (*citing* N. Cohen, *"Value" Judgments: Accounts Receivable Financing and Voidable Prefer-*

*ences Under the New Bankruptcy Code,* 66 Minn.L.Rev. 639 (1982)).

In his article, Cohen argues that the courts should look at the actual manner in which the collateral was liquidated, i.e., cost (wholesale) or ongoing concern. Whatever method is used to dispose of the collateral, Cohen argues, should be used to value the collateral 90 days before the filing of the bankruptcy petition. Cohen explains:

An individualized approach need be neither difficult to apply nor arbitrary. In each bankruptcy proceeding, the creditor or the trustee at some point liquidates the accounts receivable constituting collateral. This can be done either by collecting the accounts or by selling them. To determine whether the creditor is in a better position than it would have been had bankruptcy been declared ninety days earlier, the appropriate comparison would seem to be between the proceeds of the receivables actually liquidated after bankruptcy and the amount which would have been obtained if the receivables serving as collateral ninety days earlier had been liquidated in the same manner. In other words, if the receivables at bankruptcy were liquidated by collection, the comparison should be with the amounts actually collected from receivables serving as collateral ninety days before bankruptcy. If the receivables were liquidated by sale, the comparison should be with the amount which would have been received had the receivables serving as collateral ninety days before bankruptcy been sold. Thus, the first example adopts a collection value approach, while the second uses a market value approach. Because this individualized approach defines "value" in accordance with the method actually chosen to transform the accounts receivable to cash, it more accurately measures how much a particular creditor actually improved its eventual position during the ninety days before bankruptcy.

Cohen, *supra,* 66 Minn.L.Rev. at 664 (footnotes omitted). *See also Matter of Missionary Baptist Foundation,* 796 F.2d

752, 761–62 (5th Cir.1986) (5th Circuit found Cohen's reasoning useful, though not necessarily adopting it as a rigid rule).

■ This Court fully agrees with Cohen's and the Seventh Circuit's individualized approach to defining value. Because this approach defines "value" in accordance with the actual method a secured creditor will use to transform its security to cash, it more accurately measures how much the creditor actually improved its position during the 90–days before bankruptcy. It just does not make sense to value the security as "an ongoing concern" if the secured party, not the debtor, could not sell the security for the ongoing concern value. The value of the secured party's interest depends on what it could do outside of bankruptcy to realize on its security. *See Ebbler Furniture, supra,* at 92 (J. Easterbrook concurring) (*citing* T. Jackson, *Avoiding Powers in Bankruptcy,* 36 Stan. L.Rev. 725, 756–77 (1984)). In most cases involving inventory, what the secured party can do is seize and sell the inventory. The secured party probably could only obtain at most, the wholesale prices. Most secured lenders do not operate retail stores, and as such, could not obtain an ongoing concern value.

■ Applying the individualized approach to the present case, this Court must first look at the actual method the Bank used to transform the Coin Company's inventory to cash. On April 16, 1985, the Bank sold the entire inventory in bulk of the Coin Company to Rare Coin Company for $1,000,000.00, no higher private bid having been received by the Bank. As such, using the individualized approach in this case, the method which this Court will value the inventory is by looking to see what the inventory is worth if sold in bulk to another coin dealer 90 days before bankruptcy, i.e., bulk wholesale to another dealer.

Now that the Court has chosen the method of valuation, the inquiry now is whether the Court has sufficient evidence to determine the actual value of the inventory 90 days prior to bankruptcy for purposes of summary judgment. The answer is no.

There is evidence that the inventory actually sold for $1,000,000.00 to Rare Coin Company. However, this was the value of the inventory on hand on April 16, 1985. The Court finds this is not conclusive evidence of value during the summer of 1984. Furthermore, there is other conflicting evidence before this Court. There is some testimony on the record as to "liquidation" value at around $1,300,000.00 to $1,500,000.00 by so-called experts. For purposes of summary judgment, this Court is compelled to find that there is a genuine issue of fact as to the value of the security based on a bulk wholesale sale to another dealer 90 days before bankruptcy. As such, the motion for summary judgment based on the fully secured creditor argument, must be DENIED.

### 3. *The Mutual Release Agreement*

The Bank also moves for summary judgment of Count I by alleging that the April 16, 1985 "Mutual Release Agreement" between the Flynns and the Bank constitutes a bar to this action brought by the Flynns on behalf of the trustee. The plaintiffs, however, argue that because they are "prosecuting this action in a representative capacity, to-wit on behalf of the trustee and all unsecured creditors of the bankruptcy estate," the release cannot expressly include these claims.

■ It appears that neither the Flynns nor the Bank questions the existence and validity of the agreement. The only question concerns the legal effect of the release in the present cause of action. The legal effect of a release is to be determined by the intention of the parties as manifested by the written agreement. *St. Paul Mercury Indemnity Co. v. United States,* 201 F.2d 57 (10th Cir.1952). The written agreement states as follows:

MUTUAL RELEASE AGREEMENT

THIS AGREEMENT, made and entered into this *16th* day of April, 1985, by and between MidAmerican Bank and Trust Company, a Kansas Banking Corporation, (including all of its officers, directors, employees and agents) herein-

after collectively referred to as "MIDAMERICAN" and Joseph M. Flynn and Suz–Anne M. Flynn, husband and wife, who reside at 3912 West 143rd Street, Leawood, Johnson County, Kansas, hereinafter collectively referred to as "FLYNN".

WHEREAS, on or about the 27th day of May, 1976, FLYNN executed their certain Guaranty Agreements in favor of MIDAMERICAN, whereby they guaranteed payment of all indebtedness of Joe Flynn Rare Coins, Inc. to MIDAMERICAN, and

WHEREAS, during the months of February and March, 1983 Joe Flynn Rare Coins, Inc. borrowed 1.5 million dollars from MIDAMERICAN and executed promissory notes and security agreements in favor of MIDAMERICAN to evidence its indebtedness to MIDAMERICAN, and

WHEREAS, on or about August 24, 1984 MIDAMERICAN deemed itself insecure and demanded payment from Joe Flynn Rare Coins, Inc. and the guarantors of Joe Flynn Rare Coins, Inc.'s indebtedness to MIDAMERICAN, and simultaneously therewith "set-off" against certain checking and savings accounts on deposit with MIDAMERICAN, applying the proceeds therefrom to the satisfaction of the indebtedness of Joe Flynn Rare Coins, Inc., and

WHEREAS, on or about the 24th day of August, 1984, MIDAMERICAN commenced an action in the District Court of Johnson County, Kansas, entitled MidAmerican Bank and Trust company vs. Joe Flynn Rare Coins, Inc., et al., identified as Case No. 133421, asserting certain claims and causes of action against Joe Flynn Rare Coins, Inc., FLYNN and others, and

WHEREAS, thereafter FLYNN filed certain counterclaims against MIDAMERICAN in Case No. 133421, hereinabove mentioned, alleging that MIDAMERICAN had wrongfully accelerated its indebtedness against Joe Flynn Rare Coins, Inc., wrongfully "set-off" against the checking accounts of FLYNN and thereby breached MIDAMERICAN'S contract with FLYNN and converted FLYNN'S funds, and

WHEREAS, the parties have entered into a strict out-of-court settlement and desire to settle all claims, one against the other, arising out of the transactions described in Johnson County District Court Case No. 133421 and all other claims and causes of action of any nature whatsoever, whether or not the same are asserted in the petition of MIDAMERICAN or the counterclaim of FLYNN.

NOW, THEREFORE, in consideration of the mutual covenants and conditions hereinafter stated, MIDAMERICAN hereby releases and forever discharges FLYNN (jointly and severally), and their heirs, administrators, legal representatives and assigns, of and from any and all claims and causes of action of any nature whatsoever without limitation and *FLYNN hereby releases and forever discharges MIDAMERICAN of and from any and all claims and causes of action of any nature whatsoever without limitation.*

The parties hereby mutually agree to immediately execute Stipulations for Dismissal of their respective claims in Johnson County District Court Case No. 133421, together with approved Orders of Dismissal with Prejudice in the form attached hereto and identified as Exhibits "A" and "B".

*The parties hereto acknowledge that it is their intent that this Mutual Release Agreement be a general and unlimited release and that no party has made any representation to the other with regard to any factual matter and this release is intended to discharge the parties hereto for all claims and causes of action, regardless of whether or not they arose out of the transactions described in the parties pleadings in Johnson County District Court Case No. 133421.* The parties further acknowledge that they have had an opportunity to review this document with their respective attorneys and are satisfied that it clearly reflects their intent to a mutual total release agreement. This

Agreement shall be binding upon the heirs, executors and assigns of the parties hereto.

This Agreement made and executed the day and date first above written at Shawnee Mission, Johnson County, Kansas.

(*emphasis added*).

■ As the above emphasised clauses of the agreement indicate, the parties certainly intended to release any and all claims between the *Bank* and the *Flynns*. There is no question that the parties to the agreement intended the release to be general and unlimited. However, the question remains whether the present suit under §§ 547 and 553 is a claim between the parties to the release, meaning the Flynns and the Bank. Certainly the Bank is the defendant. But are the Flynns the actual plaintiffs in the present case? After reviewing my December 24, 1986, Order authorizing the Flynns to prosecute the claims for and on behalf of the trustee and the estate, this Court finds that the answer is no. The Flynns are not the actual plaintiffs. Rather, the Flynns are operating in a representative capacity only. The causes of action belong to the trustee and would normally be prosecuted by the trustee. However, because the trustee declined to pursue these claims, this Court authorized the plaintiffs to prosecute the actions on his behalf. If the plaintiffs win this case, the money goes to the trustee and the estate, not the Flynns.

In interpreting the agreement in this manner, this Court must always keep in mind what is in the best interest of the estate. To allow the litigation to end at this point would not be in the best interest of the estate.

### B. COUNT II—SETOFF CLAIM UNDER SECTION 553(b).

Section 553(b) of the Code governs a trustee's right to recover setoffs that result in preferential treatment of creditors. Section 553(b) provides:

(b)(1) Except with respect to a setoff of a kind described in section 362(b)(6), 362(b)(7), 365(h)(2), or 365(i)(2) of this title

[ 11 USCS § 362(b)(6), (b)(7), 365(h)(2), or 365(i)(2) ], if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.

This section is not without limits. This provision generally permits the trustee to recover only the amount set off by the creditor that represents an improvement over its position at the first date during the 90–day period on which there was an "insufficiency." 4 Collier on Bankruptcy § 553.15[2] (15th ed. 1988) (this "improvement in position test" is derived from the preference section of 547).

■ In Count II, the plaintiffs assert that the Bank substantially improved its position by setting off the Company's bank accounts on August 24, 1985. Therefore, the plaintiffs seek to recover under section 553(b)(1) "the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later date of (A) 90 days before the date of the filing of the petition; and (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency."

The Bank raises three arguments in support of its summary judgment motion on the 553 claim. First, the Bank argues that it had at all times a fully secured claim, and as such, there never was an "insufficiency" as required by section 553. Second, the Bank argues that the plaintiffs are precluded from recovery of the improvement in

position amount because the deposit accounts of the company on August 24, 1984 contained proceeds from the sale of the inventory in which the defendant had a valid perfected security interest. Finally, the Bank again argues that the "Mutual Release Agreement" between the parties bars the present action.

The Bank's first argument that the trustee cannot show an insufficiency under 553(b)(1) because it was fully secured amounts to the same argument it made under the preference section [see discussion in part A–2 of the analysis]. Since there is a genuine issue of material fact as to whether the Bank was a fully-secured creditor 90 days before bankruptcy for purposes of section 547, then it necessarily follows that there is a genuine issue of material fact as to whether the Bank was a fully-secured creditor for purposes of section 553.

The Bank's second argument is at first puzzling. However, after careful scrutiny, the argument becomes transparent. The Bank claims that the plaintiffs cannot recover the setoffs because the Bank already held a security interest in the accounts themselves. The Bank claims a security interest in the accounts based on two grounds: (1) the bank accounts contained proceeds from the sale of inventory in which the Bank had a valid, perfected security interest and (2) the bank accounts themselves were pledged as collateral to secure the Bank's loans by the terms of the Security Agreements. The Bank's argument misses the point of section 553. Section 553(a) recognizes that the lending insti-

tutions always have a right to set-off the funds either because the lending institutions are secured by the bank accounts or because the banks hold a state law lien on the accounts. However, as stated earlier, this right of setoff is limited because the Bank cannot improve its secured position. Section 553(b) is designed to limit debtors from favoring banks by stockpiling money in their accounts just prior to bankruptcy. Whether or not the Bank improved its position goes back to the material question of fact of whether the Bank was fully secured. If the Bank was undersecured, then there still is a possibility of improvement in position or reducing its "insufficiency" regardless of whether the Bank held a proper, prior security interest in the bank accounts or held a state law right of setoff of the accounts.

The Bank's third argument concerning the mutual release agreement has been fully discussed earlier. The Court previously found that the agreement did not bar the 547 action. Likewise, the agreement does not bar the 553 action.

IT IS THEREFORE, BY THE COURT, ORDERED That the defendant MidAmerican Bank and Trust Company's Motion for Summary Judgment be and the same hereby is DENIED.