In re The OHIO CORRUGATING COMPANY, Debtor.

The OHIO CORRUGATING COMPANY, Plaintiff,

v.

DPAC, INC., and Malcolm K. Sheppard, Defendants.

Bankruptcy No. B85–00900–Y.
Adv. No. 86–0003.

United States Bankruptcy Court, N.D. Ohio.

Sept. 26, 1988.

Mark Schlachet, Cleveland, Ohio, for Official Creditors' Committee.

Dixon Rich, Thomas Weiers, Jr., Pittsburgh, Pa., for DPAC II and Malcolm K. Sheppard.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Bankruptcy Judge.

This cause comes before the Court on the Amended Complaint filed by the Official Creditors Committee ("OCC") on April 13, 1987. The Complaint seeks a determination that the transfer and obligations incurred by the Debtor in connection with a leveraged buyout ("LBO")[1] should be avoided pursuant to both applicable federal and state law. This is a core proceeding as set forth in 28 U.S.C. Sec. 157(b)(2)(H).

## BACKGROUND

In 1983, MALCOLM SHEPPARD began exploring the possibility of acquiring a manufacturing company through a fully leveraged buyout. In 1984, Mr. Sheppard was introduced to the Debtor as a potential acquisition. The Debtor was a manufacturer of steel containers for the chemical and agricultural industries. Mr. Sheppard visited the Debtor's operations on July 17, 1984, and subsequently commenced an investigation into the feasibility of acquiring and operating the Debtor. The Debtor had sustained a net loss in 1982 of approximately Three Hundred Five Thousand & 00/100 Dollars ($305,000.00) while experiencing net income of approximately Eighty–Two Thousand & 00/100 Dollars ($82,000.00) in 1983. Financial forecasts prepared in August 1984 projected losses for September, October, and November 1984, with a projected profit expected in December 1984. In anticipation of a purchase, Mr. Sheppard formed DPAC, INC. ("DPAC I") in August 1984. He was at all times its sole shareholder and director.

On November 14, 1984, DPAC, INC. ("DPAC I"), and the Debtor entered into a loan agreement with SECURITY PACIFIC BUSINESS CREDIT, INC. ("SP"), whereby SP agreed to loan DPAC I One Million, Four Hundred Seventy–Five Thousand & 00/100 Dollars ($1,475,000.00) so that DPAC I could acquire the Debtor's stock from the shareholders of the Debtor. SP also agreed to finance the Debtor's working capital needs by allowing the Debtor to borrow against certain of its accounts receivable, thereby creating a revolving line of credit. In return, SP was to be granted a first-position security interest in all of the unencumbered assets of the Debtor.

After the loan transaction was completed, a new company called GEOROMAC, INC., was formed. As a result of numerous transactions, DPAC I was merged into the Debtor with the Debtor assuming part of the DPAC I obligation to SP of One Million, Three Hundred Thousand, Two Hundred & 00/100 Dollars ($1,300,200.00), secured by a lien on all of the assets of the Debtor. GEOROMAC also became sole shareholder of the Debtor and changed its name to DPAC, INC. ("DPAC II").

After the acquisition, it appears that the new management team effected various changes in the Debtor's operations to minimize expenses. The Debtor's operations apparently were successful during the first four months of operation. Beginning in April 1985, however, a significant price deterioration in the market occurred, resulting in a sizeable loss of sales volume because of the Debtor's inability to reduce its prices and stay competitive. At the same time, SP substantially reduced the number of accounts against which the Debtor could borrow, thereby curtailing the Debtor's revolving line of credit.

---

1. An LBO, or leveraged buyout, is a business transaction in which a company is sold under a financial arrangement whereby the purchasers borrow all, or substantially all, of the purchase price which is secured by mortgages on the assets of the selling company.

The Debtor filed its Voluntary Petition under Chapter 11 of Title 11 September 30, 1985. The Debtor's commission agent, who was responsible for approximately half of the Debtor's sales volume, terminated his services when the Petition was filed. As a result, reorganization became impossible and a liquidation of the business was planned. At the time of the filing of the Petition, all creditors' claims against the Company on November 14, 1984, had been fully paid. In fact, trade creditors' accounts turned over six or seven times during the Company's ten months of operation after the buyout.

When creditors realized that there would be insufficient funds for distribution to them upon liquidation, the OCC demanded that the Debtor-in-Possession take the necessary actions to avoid the transactions involved in the LBO on the grounds that it was fraudulent as to creditors of the Debtor. The Debtor took no action in response to this demand. By Order dated January 13, 1986, the Court authorized the OCC to initiate the present adversary action. As a result, the OCC originally filed this adversary action on January 13, 1986. The Amended Complaint filed on April 13, 1987, contains three (3) counts. The First Count charges that SP's loan and resultant collateralization in substantially all of the Debtor's property was a fraudulent transfer pursuant to 11 U.S.C. Sec. 548. The Second Count alleges that the same transactions constitute a fraudulent conveyance pursuant to Chapter 1336 of the Ohio Revised Code. The final count avers that the purchase of capital stock constituted an impermissible redemption of stock by reason of Ohio Rev.Code Sec. 1701.35. A trial on this matter was commenced on February 29, 1988, and concluded on March 2, 1988.

## I. PRELIMINARY MATTERS

Before considering the testimony and evidence adduced at trial, the Court wishes to address, in a preliminary fashion, three threshold issues which arise in connection with this proceeding. The Defendants urge that fraudulent conveyance law (1) is generally inapplicable to LBOs, (2) is specifically inapplicable to acquirers in an LBO, and (3) does not protect creditors whose claim matured subsequent to the transfer. We will deal with each seriatim.

## A. Applicability of Fraudulent Conveyance Law to LBOs

█ In a previous Opinion, this Court determined that federal and state statutes governing fraudulent conveyances generally could be applied to avoid LBOs. *In re Ohio Corrugating Co.*, 70 B.R. 920 (Bankr. N.D.Ohio 1987). In their Post–Trial Brief, the Defendants challenge that finding by referring the Court to the holding in *Credit Managers Ass'n. v. Federal Co.*, 629 F.Supp. 175 (C.D.Cal.1985), in which the court questioned the applicability of fraudulent conveyance law to LBOs.[2] Contrary to defendant's assertion, the court in *Credit Managers* did not decide that fraudulent conveyance law was inapplicable to LBOs. In fact, the court reserved its decision on this issue when it wrote:

> As this 'important conceptual question' [whether an LBO presents fraudulent conveyance problems] was not briefed by the parties, and as there are other grounds for its decision, the court does not answer the question.

*Id.* at 179. Moreover, this Court does not find the questions raised in *Credit Managers* to be decisive. The fact that fraudulent conveyance law originally did not envision its use to avoid LBOs is not important. The very essence of common law is its adaptability to unique situations and changing fact patterns. If the rights of creditors have been impaired, we see no reason to except LBOs from the operation of fraudulent conveyance law if the transfers otherwise fit within the statutory framework. Furthermore, the suggestion in *Credit Managers* that LBOs ought to be exempted from fraudulent conveyance law because of the occasional benefit which might inure to

**2.** Even though our previous finding constitutes the law of the case, it is felt that a response to the Defendant's Objections would be helpful in elucidating why the Court chose not to follow the implications of the dicta contained in *Credit Managers*.

creditors is not persuasive. In addition to the District Court's heavy reliance on an arguably incorrect reading of a commentary,[3] that suggestion is largely a policy matter which is most appropriately left to the consideration of Congress and state legislatures. Additionally, this Court believes that whatever merit that argument may have in partially leveraged buyouts, the argument is meritless in fully leveraged buyouts such as this.

## B. Applicability of Fraudulent Conveyance Law to Acquirers

■ The Defendants also contend that no authority exists for the proposition that transfers to a purchaser in an LBO constitute a fraudulent conveyance.[4] It is true that the reported decisions thus far have focused on the avoidability of LBO transactions based on fraudulent conveyance actions involving lenders, *U.S. v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir.1986) cert. denied — U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Greenbrook Carpet Co.*, 722 F.2d 659 (11th Cir.1984), and selling shareholders. *Kupetz v. Continental Illinois Natl. Bank & Trust Co.*, 77 B.R. 754 (C.D.Cal.1987), aff'd 845 F.2d 842 (9th Cir.1988); *Credit Managers Ass'n. v. Federal Co.*, 629 F.Supp. 175 (C.D.Cal. 1986); *In re Anderson Indus., Inc.*, 55 B.R. 922 (Bankr.W.D.Mich.1985); *U.S. v. Gleneagles Inv. Co.*, 565 F.Supp. 556 (M.D. Pa.1983) modified sub nom. *U.S. v. Tabor Court Realty*, 803 F.2d 1288 (3d Cir.1986) cert. denied, — U.S. ——, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). However, the Court believes there is as much reason to scrutinize the equivalency of the exchange between the purchaser and the selling company as between the lender or selling share-

holders and the target company. Indeed, one writer has suggested:

> In the context of an LBO, the implicit transaction between the target and the acquirer must be examined in order to determine whether a fraudulent conveyance has occurred. The target conveys value to the acquirer when the target becomes bound under the terms of the lending agreement. The acquirer gains by incurring a lower rate of interest, or by even procuring credit at all. The lender, in contrast, has not been enriched; the value of the target's guarantee is offset by the proceeds of the loan.... It is the acquirer, not the lender, who receives the benefit of the target's guarantee. Thus, the existence *vel non* of arms-length bargaining between the target and the lender is largely irrelevant to the question of whether or to what extent the target received fair consideration.

*Note, Fraudulent Conveyance Law and Leveraged Buyouts, supra* note 3, at 1503–04. The Court is persuaded that transfers between a purchaser and the target company in an LBO may be avoided as a fraudulent transfer.

## C. Applicability of Fraudulent Conveyance Law to Subsequent Creditors

The Defendants also suggest that fraudulent conveyance law may only be used to protect creditors who had a claim at the time the transfer was made. In support of this position, the Defendants cite *Credit Managers*, 629 F.Supp. at 180.

Section 548 of the Bankruptcy Code specifies the circumstances under which a conveyance may be considered fraudulent and, thus, avoidable. Sec. 548(a)(1) requires ac-

---

**3.** In *Credit Managers,* the court depended on its reading of Baird & Jackson, *Fraudulent Conveyance Law and its Proper Domain,* 38 Vand.L. Rev. 829 (1985). One writer has challenged the District Court's interpretation:

> It is argued that, as a matter of policy, fraudulent conveyance law ought to be given a narrow reading in order to exempt LBOs. The federal district court in *Credit Managers Association v. Federal Company* ... cit[ed] Professors Baird and Jackson as presenting 'compelling arguments' for such result. But the district court's reading in *Credit Managers* of

Baird and Jackson's article is incorrect. The court stated that Baird and Jackson's 'main point' is that LBOs 'can be beneficial to creditors.' But, Baird and Jackson's point is precisely that it is unclear whether or not LBOs can be beneficial to creditors.

*Note, Fraudulent Conveyance Law and Leveraged Buyouts,* 87 Colum.L.Rev. 1491, 1510–11.

**4.** The dearth of case law on this point is not surprising, given the relatively recent appearance of LBOs as a major acquisition vehicle.

tual fraudulent intent while Sec. 548(a)(2) is a constructive fraud provision. Under this latter Section, a transfer is conclusively presumed to be fraudulent when certain conditions are met. This is the Section under which the OCC is proceeding in the present case.

It is this Court's considered opinion that the constructive fraud provisions of the Bankruptcy Code may only be invoked to protect creditors whose claims existed at the time the conveyance was made or the obligation was incurred.[5] We reach this conclusion for several reasons. Initially, it must be recognized that fraudulent conveyance laws were intended to protect creditors who were otherwise unable to protect their interests when faced with impairment of those interests by debtors' actions. It appears to the Court that subsequent creditors are in a substantially different position from existing creditors. In this case, creditors appear to have willingly extended credit to the Debtor after the buyout in reliance on the performance of the "new" company. There is no suggestion that creditors were unaware of the change in either the management or the financial position of the Debtor. In fact, there was testimony that many creditors were given a current financial statement. We see no basis here for holding that the constructive fraud provisions of 11 U.S.C. Sec. 548 may be utilized as a form of insurance for creditors whose claims matured after the buyout. As the court wrote in *Credit Managers:*

> Credit could liberally be extended to such companies regardless of their assets or cash flow with the knowledge that the buyout could always be attacked later if the company folded.

*Id.* at 181. Our interpretation of 11 U.S.C. Sec. 548(a)(2) is consistent with the recent decision by the Ninth Circuit in *Kupetz v. Wolf,* 845 F.2d 842 (9th Cir.1988). Our finding here effectively disposes of the OCC's complaint as it relates to liability under the Bankruptcy Code because it was undisputed that the creditors' claims involved in this action arose after the buyout. We wish to point out, however, that even if our view of Sec. 548(a)(2) is incorrect, the OCC still would not be entitled to judgment under the Bankruptcy Code. The Court makes this alternative finding in order to expedite administration of this estate if a reviewing court should determine that the constructive fraud provisions in 11 U.S.C. Sec. 548(a)(2) may be utilized to protect creditors whose claims mature subsequent to the buyout.

## II. FRAUDULENT CONVEYANCES UNDER THE BANKRUPTCY CODE

11 U.S.C. Sec. 548(a)(2) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the Petition, if the debtor voluntarily or involuntarily—

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or become insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believe that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The burden of proof rests on the party alleging the presence of an avoidable transfer. Thus, in order to prevail under Sec. 548(a)(2), the OCC must establish four (4) elements:

---

5. It is unnecessary for the Court to make a finding regarding the protection of subsequent creditors under the actual fraud provisions of 11 U.S.C. Sec. 548(a)(1). Despite this fact, however, the Court feels the need to emphasize its belief that subsequent creditors ought to be entitled to protection under Sec. 548(a)(1) when actual fraud has been proven.

(1) A debtor's interest in property was transferred;

(2) The transfer occurred within one (1) year preceding the Petition date;

(3) An exchange for less than a reasonably equivalent value occurred;

(4) The debtor was either insolvent or severely undercapitalized on the date of transfer or was rendered insolvent or undercapitalized as a result of the transfer.

*In re Duque Rodriquez*, 77 B.R. 939, 940 (Bankr.S.D.Fla.1987); *In re Butcher*, 72 B.R. 447, 449 (Bankr.E.D.Tenn.1987).

The Defendants do not contest the first two elements. Indeed, it appears that the Debtor transferred a security interest in substantially all of its property to SP for the loan obligation, the proceeds of which was received by DPAC I. Similarly, it is also beyond dispute that the questionable transfer occurred within one (1) year of September 30, 1985, the date of filing the Petition. Therefore, the Court need only address the latter two elements.

### A. *Reasonably Equivalent Value*

 The OCC contends that the Debtor did not receive a reasonably equivalent value in exchange for its incurring of the loan obligation and transferring of the security interest. The standard requires the Debtor to have received either a direct or indirect economic benefit in order to constitute reasonably equivalent value. *In re Ohio Corrugating Co.*, 70 B.R. at 927. In this proceeding, the Debtor incurred an obligation whereby it encumbered virtually all of its assets to SP for the benefit of DPAC I, which received the loan proceeds used to purchase the Debtor's outstanding stock. DPAC I then conveyed the Debtor's stock to DPAC II, of which Mr. Sheppard was the sole shareholder. Thus, DPAC I received a controlling equity interest in the Debtor without any transfer of consideration to the Debtor in exchange for the

Debtor's incurrence of a security interest in virtually all of its assets. As a result, the Debtor did not receive a reasonably equivalent value in exchange for the obligation it incurred. DPAC II, as the successor in interest to DPAC I, expressly assumed most of the liabilities of DPAC I, including the liability resulting from the fraudulent transfer.[6] As a result, the liability of DPAC I and DPAC II is coterminous.

### B. *Financial Condition of the Debtor*

The other element which the OCC must prove in this proceeding is that the Debtor's financial condition fulfilled the statutory provisions. The Code specifies three (3) alternative showings which may establish this element. Plaintiff must show that the debtor (1) was insolvent either before or as a result of the transfer; or (2) was undercapitalized; or (3) intended or believed debts would be incurred beyond its ability to pay as such debts matured. We need not deal with the latter two elements because the OCC elected to proceed on the basis of the Debtor's insolvency alone.

A debtor is deemed to be insolvent when "the sum of such entity's debts is greater than ... [a fair valuation] of such entity's property." 11 U.S.C. Sec. 101(31)(A). Fair valuation has been construed to refer to the fair market value of the Debtor's assets and liabilities within a reasonable time of the transfer. *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir.1985). This explanation was expanded upon by the court in *In re Joe Flynn Rare Coins, Inc.*, 81 B.R. 1009 (Bankr.D.Kan.1988), where it wrote:

[F]air value does not mean the amount the property would bring in the worst circumstances or in the best.... For example, a forced sale price is not fair value though it may be used as evidence on the question of fair value.... The general idea of fair value is the amount

---

**6.** Even if there had been no express assumption, it appears that the transferee of an acquirer would not be insulated from the right of avoidance by reason of that transfer. 11 U.S.C. Sec. 550(a). Accordingly, the Court believes that when an original purchaser in an LBO conveys

property (which was acquired in a transaction subject to avoidance as a fraudulent conveyance), the transferee takes the property subject to a right of avoidance unless the transferee is a bona fide purchaser for value without notice. *11 U.S.C. Sec. 550(b)*.

of money the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonably prudent and diligent businessman with his interests in mind, especially a proper concern for the payment of his debts.

*Id.* at 1017. We will shortly consider the merits of several differing valuations in analyzing the Debtor's solvency.[7] A plethora of financial information was introduced in an attempt to prove the insolvency of the Debtor after the transfer date of November 14, 1984. We will use the Debtor's November 30, 1984 balance sheet ("NBS") as a basis upon which to determine the Debtor's solvency. If the Court finds the Debtor was insolvent as of November 30, 1984, the Court can presume that the Debtor was also insolvent sixteen (16) days earlier, in the presence of evidence indicating the Debtor's financial situation had not changed materially during the intervening period.[8]

The Debtor's NBS recites total liabilities of about 1.5 million dollars against total assets of approximately 3.8 million. However, the OCC contends that the Debtor's balance sheets must be modified in several important respects in order to produce a balance sheet which more nearly reflects the actual financial condition of the Debtor.

### 1. VALUATION OF ASSETS

The Plaintiff first maintains that the value of land, machinery and equipment ought to be recalculated. The Defendants support a valuation of One Million, Four Hundred Twenty–Six Thousand, Six Hundred

Four & 00/100 Dollars ($1,426,604.00) for the property, plant and equipment. The Court believes that such a valuation would be excessive. The Court will accept the Andrako and Associates appraisal of Four Hundred Fifty Thousand & 00/100 Dollars ($450,000.00) as the base value for the land, buildings and two cranes.[9] However, the appraisal evidently did not make adjustment for the needed repair and replacement of the roof covering the plant building. Documentary evidence indicates that a cost of Two Hundred Eighty–Six Thousand & 00/100 Dollars ($286,000.00) had been quoted for such a replacement. Testimony also indicated that required roof repairs in excess of Forty Thousand & 00/100 Dollars ($40,000.00) would have to be deducted dollar for dollar from the appraisal. Thus, if Two Hundred Forty–Six Thousand & 00/100 Dollars ($246,000.00) is subtracted from the Andrako appraisal, a remainder of Two Hundred Four Thousand & 00/100 Dollars ($204,000.00) is left. Accordingly, the Court assigns this value to the property and buildings.

The value assigned to the machinery and equipment has shown considerable variance. A walk-through appraisal ("wta") of Six Hundred Fifty Thousand & 00/100 Dollars ($650,000.00) was rendered on October 8, 1984. On November 5, 1984, a "going concern" value ("gcv") of the machinery was set at One Million & 00/100 Dollars ($1,000,000.00) Finally, a "nuts and bolts" appraisal ("nba") of Four Hundred Eighty–Two Thousand, Nine Hundred Twenty–Five & 00/100 Dollars ($482,925.00) was given on August 23, 1985. A "wta" is generally considered to be an approximation based

---

**7.** We reject the OCC's contention that going-concern valuations are unreasonable. As *Collier on Bankruptcy* suggests:

There is overwhelming authority to the effect that normally ... [fair] valuation must be made from the vantage of a going concern and that subsequent dismemberment or impossibility to dispose of plant, equipment, inventory, etc., as an entirety should not enter into the picture.

2 *Collier on Bankruptcy,* Sec. 101.31[4] (15th ed. 1988).

**8.** Such a finding has been termed "retrojection," which use was explicitly approved in *Hassan v.*

*Middlesex County Nat'l. Bank,* 333 F.2d 838, 848 (1st Cir.), *cert. denied* 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964). *See also, Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281, 1284 (1st Cir.1971); *In re Edward Harvey Co.,* 68 B.R. 851, 857 (Bankr.D.Mass.1987). The Sixth Circuit has apparently not addressed this issue.

**9.** The Andrako appraisal assigned a value of $47,800.00 to the land. The Court is more inclined to accept the Debtor's valuation of $14,-065.00, as reflected on its balance sheets. Nevertheless, the Court will accept the Andrako appraisal *in toto.*

upon visual inspection. On the other hand, a "nba" involves the identification and listing of each item of machinery and equipment to which values are assigned. The Court finds the "nba" to be more reliable than the "wta" based upon the character of the two appraisals. We also credit the "nba" over the "gcv" because the "nba" more nearly reflects a proportional amount of the eventual sale price of Four Hundred Sixty Thousand & 00/100 ($460,000.00) for all assets of the estate conducted in May, 1986.[10] Accordingly, for purposes of determining insolvency, the Court will credit the "nba" of Four Hundred Eighty–Two Thousand, Nine Hundred Twenty–Five & 00/100 Dollars ($482,925.00).

The OCC also suggests that the inventory should be discounted by percentages which would reflect the amount one could realize from a public auction. However, the Court believes this would unfairly assign a liquidation value to the inventory rather than a going concern value. Indeed, it appears to the Court that the inventory ought to be valued on a cost basis rather than the LIFO adjusted basis which was utilized. We feel the cost basis more accurately reflects a going concern value than the LIFO adjusted basis. Therefore, the Court's reconstituted balance sheet will show inventory valued at cost.

## 2. UNDISCLOSED LIABILITIES

The Plaintiff also contends that the Debtor failed to record a number of liabilities on its balance sheet. First, the Plaintiff charges unfunded benefits arising under the Pension Plan amounted to a minimum of Five Hundred Sixty–Two Thousand, Eighteen & 00/100 Dollars ($562,018.00), which amount should have been noted as a liability on the Debtor's balance sheet. In response, the Defendants introduced testimony by Mr. Robert Grace, a

managing partner in Ernst & Whinney. Mr. Grace indicated that

> [T]he disclosure of vested benefits or past-service kinds of liabilities are ... future liabilities and ... appropriate accounting ... would not require those kinds of liabilities to be recorded [before the benefits actually accrue].

The Court recognizes that generally accepted accounting principles ("GAAP") do not control a court's decision regarding the solvency of an entity.[11] However, the Court is inclined to assign presumptive validity to the treatment of assets and liabilities according to GAAP. To do otherwise would unfairly penalize the LBO participants who reasonably relied on GAAP in assessing the solvency of the Debtor prior to the buyout. In this case, the Plaintiff failed to show the unreasonableness of treating the liability for unfunded Plan benefits as a future liability justifying its exclusion from the balance sheet.

Furthermore, Announcement 36 from the Financial Accounting Services Board (FASB 36) only requires footnote disclosure of unfunded defined benefit plan obligations; it requires inclusion neither on the balance sheet nor in a court's solvency analysis. The Plaintiff's contention that off-balance sheet liabilities should be considered in a solvency analysis are not well-taken. The Court feels that participants in an LBO must be protected from the perfect hindsight often evidenced in creditors' subsequent attacks on the corporate buyout. GAAP is a reasonable measure of what liabilities ought to be included in a balance sheet and, therefore, in the solvency analysis.

None of the cases cited by the OCC to support the inclusion of contingent liabilities in a solvency analysis interpret Section 548 of the Bankruptcy Code. Finally, the Court is unconvinced that valuing the Plan's bond portfolio at maturity value was

---

10. The actual sale price is not given more weight because it is eighteen (18) months removed from the relevant time period and the Court believes it reflects a liquidation value instead of a fair value. *See* note 7.

11. In spite of their propriety according to GAAP, a court may modify balance sheet entries (i.e., increase/decrease the value of an asset or reduce/elevate the amount of the liability) in order to more accurately reflect the financial condition of the Debtor. *In re Arrowhead Gardens, Inc.*, 32 B.R. 296 (Bankr.D.Mass.1983).

patently unreasonable given the fact that the Debtor intended to hold the bonds until maturity.

The only other significant unrecorded liability appears to be approximately Four Hundred Seventy–Two Thousand & 00/100 Dollars ($472,000.00) in steel invoices. The absence of such entries would materially affect the accuracy of liabilities noted on a balance sheet. As a result, this amount will have to be recognized on the Court's reconstituted balance sheet. The Court considers the undisclosed liability of Two Thousand, Two Hundred Two & 00/100 Dollars ($2,202.00) attributable to a 1983 automobile lease to be insignificant and of minimal impact. Finally, speculation concerning uncertain and indeterminate liability resulting from possible environmental violations must be discounted.[12]

The Defendants contend that the Debtor was solvent because it was able to pay its debts as such obligations matured. This argument will be considered below. However, it should be noted that if insolvency is clearly demonstrated according to a balance sheet determination, the Debtor's ability to pay its debts as they mature is irrelevant. On the other hand, the Debtor's ability to pay its debts as they mature may be relevant where evidence of balance sheet insolvency appears to be either speculative or inconclusive.

Based on the foregoing, the Court believes that the most accurate balance sheet which can be compiled to determine the Debtor's solvency would reveal the following financial condition as of November 30, 1984:

**ASSETS**

| | |
|---|---:|
| Cash/Accounts Receivable/Securities | $ 760,712 |
| Inventories | 700,464 |
| Prepaid Expenses/Miscellaneous | 86,962 |
| Machine & Equipment | 482,925 |
| Property & Buildings | 204,000 |
| Total Assets | $2,235,063 |

**LIABILITIES**

| | |
|---|---:|
| Accounts Payables | $1,343,123 |
| Accrued Expenses | 290,023 |
| SP Loan | 1,300,000 |
| Total Liabilities | $2,933,146. |

While the reconstituted balance sheet would indicate that the Debtor was insolvent by almost Seven Hundred Thousand & 00/100 Dollars ($700,000.00), we are not confident that this balance sheet is entirely accurate. We view the reconstituted balance sheet to be important evidence tending to show the Debtor's insolvency. But, our lack of faith in the numbers precludes us from according a conclusive presumption of insolvency of the Debtor based on the reconstituted balance sheet alone. As a result, the Court feels the need to canvass other factors in order to determine whether or not they would support a finding of insolvency.

## 3. OTHER FACTORS

There is no evidence that DPAC I, DPAC II, or MALCOLM SHEPPARD ever intended to defraud the Debtor's creditors. Indeed, this Court rejected such a claim when it ruled on the Defendant's Motions for Summary Judgment. *In re Ohio Corrugating Company*, 70 B.R. at 928. While a fraudulent conveyance claim may be established by constructive intent, the OCC has not upheld its burden of proof to support a finding of constructive fraud. Furthermore, there appears to be a requirement of a small degree of scienter or awareness of fraud in cases brought under Sec. 548(a)(2) for the purpose of avoiding LBO's.[13] This was the approach taken in *Kupetz v. Wolf*, 845 F.2d at 842. While the Court believes that the constructive fraud provisions ought to be construed as requiring some degree of scienter, it is unnecessary to so hold. It is enough to find that Defendant's intent would not contribute anything to buttress a finding of insolvency.

---

12. The Court was unable to find support for certain other undisclosed liabilities which the OCC noted could be found in Schedule D of CX No. 46 and CX No. 98.

13. One commentator has urged the adoption of a variable good faith standard in constructive fraud cases. Under this approach, the degree of scienter required would vary depending on the business context, the defendant's role in the transaction, and the competing policies at issue. *See* Sherwin, *Creditor's Rights against Participants in a Leveraged Buyout*, 72 Minn.L.Rev. 449, 516 (1988).

The Debtor's history of operating losses is cited by the Plaintiff as evidence of insolvency. However, the Court is reluctant to rely on these reports because it appears that the profit/loss figures are skewed in both 1982 and 1983. In 1982, the Debtor elected to discontinue the steel pail line and wrote it down to its estimated realizable value, resulting in a sizeable loss. In 1983, the line was sold at a profit, which contributed to the profit that Debtor reported that year. In addition, the Court does not feel that any helpful inferences can be drawn regarding the Debtor's solvency in 1984 from the Debtor's profitability in the years preceding 1982.

The most important factor which tends to support the Debtor's solvency after the buyout was its ability and practice of paying its debts as they matured. Testimony showed that during the Debtor's normal operating cycles, trade creditors were paid off at least six or seven times over the ten-month period of operation after the buyout. This may have been due, in large part, to the revolving line of credit provided by SP which allowed the Debtor to borrow against its accounts receivable. In any event, this factor tends to belie the contention that this was a company which was in the throes of insolvency.

Finally, the Court is not convinced that Debtor's insolvency resulted from the buyout. The Court is persuaded that industry-wide price reductions, declining sales volumes, and an inability to borrow fully against its accounts receivable were primarily responsible for the Debtor's eventual insolvency.

In summation, the Court must find that there is insufficient evidence to buttress the inference of insolvency drawn from the admittedly doubtful reconstituted balance sheet. Thus, we must find that the OCC failed to sustain its burden of proving insolvency which is necessary if we are to find liability under Sec. 548 of the Bankruptcy Code.

### III. FRAUDULENT CONVEYANCES UNDER OHIO LAW

Ohio Revised Code Ann. Sec. 1336.-04 (Anderson, 1979) provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

As in our consideration under 11 U.S.C. Sec. 548(a)(2), the threshold issue that must be addressed is whether subsequent creditors may assert a cause of action based on the constructive fraud provision found in Ohio Rev.Code Sec. 1336.04. This Court finds that Ohio law does not permit a creditor whose claim matured subsequent to the allegedly fraudulent transfer to set aside the transfer pursuant to Ohio Rev.Code Sec. 1336.04. An early Ohio Supreme Court case held that a conveyance was not avoidable for merely constructive fraud at the instance of a subsequent creditor. *MacQueen v. Dollar Sav. Bank Co.*, 133 Ohio St. 579, 15 N.E.2d 529 (1938). Although Ohio Rev.Code Secs. 1336.05 and 1336.06 now speak explicitly in terms of authorizing certain constructive fraud actions against future creditors, Sec. 1336.04 is silent as to its applicability to future creditors. By including subsequent creditors in the constructive fraud provisions found in Ohio Rev.Code Secs. 1336.05 and 1336.06, we are compelled to presume that the Ohio legislature purposely excluded subsequent creditors from the ambit of the constructive fraud provision found in Ohio Rev.Code Sec. 1336.04. Thus, the *MacQueen* decision continues to be valid as it pertains to that provision.

The Court has already outlined how all creditors who existed at the time of the buyout have been paid, and all present claims were created after the transaction. Therefore, we find no obligation of the Defendants on the basis of Ohio Rev.Code Sec. 1336.04.

### IV. IMPROPER STOCK REDEMPTION

The OCC's final argument is that the LBO constituted an impermissible redemption of stock under state law. Ohio

Rev.Code Ann. Sec. 1701.35 (Anderson 1985) reads, in part:

> (B) A corporation shall not purchase its own shares, except as provided in this Section, nor shall a corporation purchase or redeem its own shares if immediately thereafter its assets would be less than its liabilities plus its stated capital, if any, or if the corporation is insolvent, or if there is reasonable ground to believe that by such purchase or redemption it would be rendered insolvent.

As used in this Section, "insolvent" means that "the corporation is unable to pay its obligations as they become due in the usual course of affairs." Ohio Rev.Code Ann. Sec. 1701.01(O) (Anderson 1985 & Supp. 1987).

The Court does not view the payments to the Debtor's former shareholders as a distribution *by the Debtor* to its former shareholders. They received the payments to which they were entitled under the agreement with DPAC I. Furthermore, even if these payments were deemed to be distributions within the meaning of Ohio Rev. Code Ann. Sec. 1701.35(B), the Court has already outlined how the Debtor paid its obligations as they matured over after the buyout. Thus, the Debtor would not be "insolvent" as that term is defined for purposes of Ohio corporate law in Ohio Rev. Code Ann.Sec. 1701.01(O) (Anderson 1985 & Supp.1987). Accordingly, the OCC's final argument is not well-taken.

CONCLUSION

While transfers between a purchaser and the target company in an LBO ought to be subject to avoidance as a fraudulent transfer, a purchaser in an LBO transaction should not be required to be an insurer of the ultimate success of the purchased enterprise, except by legislative action determining public economic policy. Our extensive consideration of the evidence and applicable law in this action convinces us that, as regards the remaining Defendants, DPAC II and MALCOLM K. SHEPPARD, there is an insufficient basis shown for avoiding this LBO transaction. Judgment shall be entered for Defendants DPAC II and MALCOLM K. SHEPPARD.

This Memorandum Opinion shall constitute the Court's findings and conclusions pursuant to Bankruptcy Rule 7052. An appropriate Order shall enter.