In re JOSHUA SLOCUM, LTD., a Pennsylvania Corporation, Debtor.

In re JOSHUA SLOCUM, LTD., a Delaware Corporation, Debtor.

JOSHUA SLOCUM, LTD., a Pennsylvania Corporation and Joshua Slocum, Ltd., a Delaware Corporation, Plaintiffs,

v.

Gregory BOYLE, Defendant.

Bankruptcy Nos. 88–14082S, 88–14083S.
Adv. No. 89–0050S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 3, 1989.

Melvin Lashner, Philadelphia, Pa., trustee.

William M. Lashner, Philadelphia, Pa., for trustee.

Carl H. Delacato, Jr., Hecker Brown Sherry and Johnson, Philadelphia, Pa., Robert Burrick, Warshaw, Burnstein, Cohen, Schlesinger & Kuh, New York City, for debtors.

James W. Adelman, Philadelphia, Pa., for Creditors' Committee.

Charles M. Golden, Marc N. Bell, Obermayer, Rebmann, Maxwell & Hippel, Philadelphia, Pa., for defendant.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Richard S. Fehling, Reading, Pa., for Meridian Bank.

Natalie Ramsey, Philadelphia, Pa., for Peat Marwick Main and Co.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The present adversary proceeding represents the efforts of the Debtors' Trustee in these jointly-administered Chapter 11 bankruptcy cases to set aside payments made under a Termination [of employment] Agreement, also contemplating redemption of the Debtors' stock, between the Debtors and the Defendant, their former President. The Trustee argues that the payments under the Agreement constituted fraudulent transfers under both state law and the Bankruptcy Code and, with respect to those payments made within ninety (90) days of the bankruptcy filing, were avoidable preferences. In addition, the Trustee contends that the stock redemption was prohibited under the Pennsylvania Business Corporate Law. We decide the closest issue in this matter by concluding that the Debtors were insolvent at the time of the payments in issue or, at a minimum, were rendered insolvent by the payments. We also find that there is no evidence that anything of value other than the worthless stock of the insolvent Debtors was received by them as consideration. As a result, we believe that the stock transfers in issue may indeed be avoided.

### B. PROCEDURAL HISTORY

Joshua Slocum, Ltd., a Delaware Corporation (hereinafter "JSD"), and Joshua Slocum, Ltd., a Pennsylvania Corporation (hereinafter "JSP"), both filed voluntary petitions under Chapter 11 of the Bankruptcy Code on November 21, 1988 (JSD

and JSP are jointly referred to as "the Debtors"). A complete history of these cases is set forth in a prior Opinion of March 29, 1989, in this case, reported at 99 B.R. 250, 251–52 (hereinafter referred to as "Opinion I"). For the purposes of this proceeding, we note only that, on November 23, 1988, this court entered an Order granting the Debtors' Motion for Joint Administration of these two cases. After a very brief period of post-filing operations, the Debtors, on December 14, 1988, moved for permission to sell all of their inventory. On January 4, 1989, the inventory was sold to a liquidator for $1,020,000. On March 8, 1989, the Debtors sold their store leases in a bidding process grossing about $560,000.

The present adversary Complaint was filed by JSP on January 27, 1989. The Complaint alleges that JSP paid the Defendant $94,500.00 as redemption of the Defendant's stock in JSP and that this redemption was in violation of the provisions of the Pennsylvania Business Corporation Law, 15 P.S. § 1701 B, and therefore avoidable pursuant to 11 U.S.C. § 544(a). The Complaint also alleges that the redemption was made while JSP was insolvent and that the redemption enabled the Defendant to recover more than he would have received under a Chapter 7 liquidation.

On February 16, 1989, an Order was entered granting the appointment of Melvin Lashner, Esquire, as Trustee for both Debtors. Trial of this proceeding, originally scheduled for March 15, 1989, was continued until May 24, 1989.

During the trial, it became apparent that JSD was the appropriate party to pursue the Complaint. Accordingly, the Complaint was amended by agreement of the parties to include JSD as a party plaintiff. Also by agreement of counsel, the Complaint was amended to state a cause of action under 11 U.S.C. § 548 (fraudulent transfers) and 11 U.S.C. § 547 (preferential transfers) of the Bankruptcy Code.

Prior to commencement of the trial, the parties submitted a Stipulation of Facts which included a number of exhibits which were admitted into evidence by agreement of the parties. In addition, the Trustee himself testified regarding the financial circumstances of the Debtors. The Trustee also presented testimony from Jim Stutts (hereinafter "Stutts"), former chief financial officer of the Debtors, and Mr. Andrew Jordan (hereinafter "Jordan"), a partner with the accounting firm of Peat Marwick Main & Co. (hereinafter "Peat"), who testified regarding his audits of the financial records of the Debtors.[1]

By Order entered after the trial of May 25, 1989, the parties were given an opportunity to submit proposed Findings of Fact and Conclusions of Law and Briefs, the Debtors' submissions being due on June 9, 1989, and the Defendant's submissions being due on June 23, 1989. These submissions were timely filed and the matter is now ripe for disposition.

## C. FINDINGS OF FACT

1. JSD, the Debtor in Bankruptcy No. 88–14082S, is a Delaware corporation. JSD is a holding company whose sole asset is its fully-owned subsidiary JSP, a Pennsylvania corporation and the Debtor in Bankruptcy No. 88–14083S.

2. JSP was the operating company through which all payments from the two corporations are made. JSD acquired JSP through a leveraged buy-out in December, 1985.

3. The Debtors' operations were originally begun as a retail subsidiary of J.G. Hook, Inc. (hereinafter "Hook"), a large manufacturer of women's clothes, which was spun off from Hook in the early 1980's, and thereafter maintained stores

---

1. Two days prior to trial, Jordan filed a motion to quash his trial subpoena and for sanctions because the Trustee, allegedly contrary to earlier agreements, intended to call him as an expert witness without employing him as a professional. In an Order of May 22, 1989, we denied this motion, holding that any party may call any person as a witness in any capacity as of right unless the strong showing necessary to quash a subpoena were made. *See* 5A J. MOORE, FEDERAL PRACTICE, ¶ 45.05[3], at 45–36 to 45–48 (2d ed. 1988). Thus, although Jordan was called as the Trustee's witness, he was not as clearly within the Trustee's control to the same degree that a party's expert witness would normally be.

under the name "Post Horn" or "Sparrs." See Opinion I, 99 B.R. at 251.

4. For the purpose of preparing financial statements as well as fiscal management, JSD and JSP were treated as a single entity.

5. The Defendant, Gregory Boyle (herein "the Defendant"), was one of the investors of the leverage buyout of JSP and thereafter became President of both of the Debtors.

6. On December 19, 1986, Boyle entered into a five-year employment contract with the Debtors whereby he was to be compensated at a rate of $100,000.00 per year.

7. Admitted into evidence in this matter is a Consolidated Financial Statement of both Debtors for the fiscal years ending January 31, 1988, and 1987, which was accompanied by an audit report from Peat (hereinafter referred to as "the Financial Statements").

8. According to the Financial Statements, 309,288 shares of Class A preferred stock and 1,906,780 shares of Class B preferred stock were authorized, issued, and outstanding on January 31, 1988.

9. The Restated Certificate of Incorporation (hereinafter "the Certificate") for JSD granted holders of Class A and Class B Stock certain rights and preferences upon liquidation or dissolution of the company.

10. In the event of liquidation, the holders of Class B preferred stock were entitled to $1.58 per share plus any dividends which were accrued but unpaid. If, upon liquidation of the company, either voluntary or involuntary, the assets to be distributed among holders of Class B stock were insufficient to permit payment in full to the holders of Class B stock, then the entire assets of the corporation to be distributed were to be distributed ratably among the holders of Class B stock.

11. After the liquidation preference payments described above had been made to holders of Class B stock, holders of Class A stock would then be entitled to a payment of $6.79 per share before any payment could be made to any junior classifications of stock. Pursuant thereto, holders of Class B stock would be entitled to an additional payment of $.78 per share. If the assets remaining were not sufficient to permit these payments, then the remaining assets would be distributed ratably to the holders of Class A and Class B stock.

12. Holders of Class A and Class B stock were entitled to receive dividends when and as declared by the Board of Directors, before dividends were paid to holders of common stock. Holders of Class B stock were entitled to cumulative dividends in the amount of $.16 per share. However, the corporation was under no obligation to pay such dividends unless they were declared by the Board.

13. The Certificate provided for the mandatory redemption of Class A and Class B stock over a three-year period beginning December 19, 1992. Class A stock was to be redeemed by paying $6.79 per share plus any declared but unpaid dividend. Class B stock was to be redeemed by paying $2.58 per share plus accrued and declared dividends which had not been paid.

14. The Certificate provides that if the funds "legally available" to the Company were insufficient to redeem the outstanding preferred stock, then the holders of the stock would share ratably in all funds legally available for redemption. The Certificate further provides that if the Debtors failed to redeem the stock "for any reason or for no reason," then the price of converting the preferred stock to common stock would be reduced.

15. Stutts was the chief financial officer of the Debtors from December, 1985, through the time of their liquidation. He holds a joint degree in accounting and economics and has seventeen (17) years of accounting experience. Stutts testified that the Debtors had never been very profitable. In fact, according to Stutts, from mid-1987 on, the Debtors were losing money at a rate of at least $100,000 per month. Due to financial difficulties, the Debtors were frequently unable to pay bills within the terms of the invoices. By August, 1988, the Debtors were unable to pay their bills to most of their major vendors as they

fell due. The Debtors then borrowed money from investors in the form of demand notes to meet their financial obligations. Notes accompanying the Financial Statements indicate that the Debtors issued demand promissory notes in January, 1988, for $2,000,000.00 and on June 3, 1988, in the amount of $250,000.00.

15. Stutts testified that between January 31, 1988, and March 23, 1988, the Debtors suffered approximately $600,000 in losses.

16. In November, 1987, the Debtors defaulted on their loan agreement with their major lender, Meridian Bank (hereinafter "Meridian"). A standstill agreement was negotiated and entered into between the Debtors and Meridian. The Debtors defaulted on that agreement in April, 1988, and entered into a series of standstill agreements with Meridian after that date.

17. In January, 1987, the Debtors defaulted on a loan obligation to Hook in the approximate amount of $400,000 and the balance on this obligation was accelerated. The Debtors and Hook also entered into a standstill agreement on March 18, 1988.

18. Stutts testified regarding the post-petition sale of the company assets. The Debtors' inventory, which had been valued on the Debtors' financial records at approximately $2,200,000.00, was sold to a liquidator for $1,020,000.00. *See* Opinion I, 99 B.R. at 251. In addition, he noted that all of the property and equipment located in the Debtors' stores had been sold for approximately $35,000.00.

19. Despite the overall gloomy financial situation reflected in Stutts' testimony, he stated, on cross-examination, that the Debtors' assets, valued on a going concern basis, exceeded their liabilities on March 23, 1988, and on November 11, 1988.

20. On March 23, 1988, JSD and the Defendant entered into a Termination Agreement. Pursuant to the Termination Agreement, the parties agreed to terminate Defendant's employment agreement, with insurance benefits continuing to December, 1988. In addition, the Defendant agreed to sell his 500,000 shares of JSD to JSD for $176,500. Pursuant to the Termination

Agreement and a promissory note executed by the same parties in connection therewith, the Defendant was to receive an initial payment of $26,500.00 and $150,000.00 to be paid in seventy-five (75) consecutive weekly installments of $2,000.00 each.

21. The Defendant received the $26,500 payment from the Debtors on March 23, 1988, pursuant to the Termination Agreement. Thereafter, he received weekly payments until the Debtors filed their bankruptcy petitions on November 21, 1988. The Defendant received a total of $94,-500.00 pursuant to the Termination Agreement.

22. Within ninety (90) days of filing their petition, the Debtors paid a total of $26,000 to the Defendant pursuant to the Termination Agreement and promissory note. This total includes a check for $2,000 that was issued on August 19, 1988, and cashed on August 24, 1988.

23. Admitted into evidence in this matter were certain Consolidated Balance Sheets for the Debtors, which were part of the Financial Statements. The Balance Sheets reflect that, as of January 31, 1988, the Debtors had total assets of $9,596,-845.00 and a total of liabilities and stockholders' equity of $9,596,845.00. Included among the assets of the Debtors listed therein were the following:

| | |
|---|---|
| Merchandise inventory | $3,739,843.00 |
| Supplies inventory | 17,538.00 |
| Machinery and equipment | 239,281.00 |
| Leasehold improvements | 3,016,799.00 |
| Trucks | 10,759.00 |
| Furniture and Fixtures | 779,686.00 |

24. Notes accompanying the Financial Statements indicate that the inventory was valued at the lower of cost or market while property and equipment were valued at cost.

25. The Financial Statements reveal substantial increases in the valuation of the following assets between 1987 and 1988:

| | 1988 | 1987 |
|---|---|---|
| Merchandise inventory | $3,379,843 | $1,998,235 |
| Leasehold improvements | 3,016,799 | 1,670,944 |
| Furniture and Fixtures | 779,686 | 198,369 |

No reason is given in the Financial Statements for the substantial increases in these values.

26. The liabilities side of the ledger sheet included $7,099,229.00 in current liabilities and $50,694.00 for obligations under leases. Also stated separately on this side of the ledger was a $2,497,616.00 entry for stockholders' equity.

27. The Consolidated Statement of Stockholders' Equity accompanying the Financial Statements indicate an accumulated deficit of $4,168,285.00 as of January 31, 1988. There does not appear to have been any unrestricted capital surplus in existence on January 31, 1988.

28. The Debtors' Consolidated Statements of Cash Flows accompanying the Financial Statements indicates net cashflow losses of $615,817.00 for 1987 and $3,042,213.00 for 1988.

29. The Notes accompanying the Financial Statements state that the Debtors had incurred "financial statement and tax losses" in each year since their inception and that, as a result, no "income tax expense for operations" was provided for in the Financial Statements.

30. Jordan is a partner with Peat, where he has worked since 1973. He holds an MBA from Rutgers. Jordan was involved with the audit of the Debtors' Financial Statements.

31. As part of their audit, Peat reviewed and evaluated internal accounting controls as well as reviewing the financial statements of the Debtors. Jordan pointed out that it is the company, and not the auditors, that assigns values to assets and liabilities. Jordan suggested that the Debtors' leasehold improvements had no value independent of the Debtors' leasehold interests.

32. Jordan testified that, under SEC regulations, mandatorily redeemable stock is generally not classified as equity, but would be listed somewhere between liabilities and shareholder equity on the balance sheet. However, Jordan also testified that SEC regulations did not apply to the Debtors since they were not publicly-held corporations. He noted that it was the Debtors that chose to characterize shareholder redemption rights as stockholders' equity rather than liabilities. Jordan testified that such a classification fell within guidelines of generally accepted accounting principles (hereinafter "GAAP") and that he concurred with his auditor's classification of redemption rights as equity.

33. Jordan testified that, according to the Financial Statements, on January 31, 1988, the assets of the Debtors exceeded their liabilities.

34. The Trustee testified that the sales of the Debtors' rights in its leases on March 8, 1989, resulted in a gross payment of $560,500.00 which, after payment of expenses, resulted in net income to the estate of approximately $410,000.00.

35. The Trustee also testified that, as of May 24, 1989, the account of the Debtors' estate had a balance of $455,330.23. He further testified that the following claims remain against the Debtors' estate:

| | |
|---|---|
| Hook | $ 300,000.00 |
| Unsecured claims | 1,600,000.00 |
| Claims by prior landlords | 400,000.00 |
| Administrative expenses | 100,000.00 |

36. The Trustee projected that the Debtors' creditors would receive a distribution between ten (10%) percent to twenty-five (25%) percent on their claims.

37. The Trustee thus expressed an opinion that the Defendant would receive less in a Chapter 7 distribution than he actually received under the Termination Agreement.

## D. CONCLUSIONS OF LAW/DISCUSSION

We shall first address the arguments of the Trustee that the Termination Agreement and payments to the Defendant may be avoided as fraudulent transfers under 11 U.S.C. § 548(a)(2) of the Bankruptcy Code. This section provides in pertinent part as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

The parties do not dispute that the Termination Agreement and promissory note constituted an obligation incurred by the Debtor within one year of the filing of the petition. However, they do seriously dispute both whether reasonably equivalent value was given in exchange for this obligation and whether the Debtor was insolvent when it incurred this obligation. We shall address each of these issues in turn.

### 1. THE DEBTOR DID NOT RECEIVE REASONABLY EQUIVALENT VALUE FOR THE OBLIGATION THAT IT INCURRED TO BOYLE.

■ Whether an exchange or obligation was undertaken for reasonably equivalent value depends on the facts of each case. *In re Pinto*, 89 B.R. 486, 499 (Bankr.E.D. Pa.1988), *modified*, 98 B.R. 200 (Bankr.E. D.Pa.1989). *Accord*, 4 COLLIER ON BANKRUPTCY, ¶ 548.09, at 548–108 to 548–109 (15th ed. 1989). In the present case, the Debtors incurred an obligation to pay the Defendant $176,500.00 and to continue his insurance coverage for an eight-month period at an unspecified cost to the company in entering into the Termination Agreement. In return, the Debtors received 500,000 shares of their own common stock held by the Defendants; termination of the Defendant's employment agreement; and a waiver of any claims that the Defendant might have against them in connection

with either the employment agreement or the stock issuance.

■ We do not believe that any value was given by return of the 500,000 shares of common stock to the Debtors. The courts have uniformly concluded that a stock redemption by an insolvent company fails to supply reasonably equivalent value to the company. *See, e.g., In re Roco Corp.*, 701 F.2d 978, 982 (1st Cir.1983); *Schafer v. Hammond*, 456 F.2d 15, 17–18 (10th Cir.1972); *M.V. Moore & Co. v. Gilmore*, 216 F. 99, 100–01 (4th Cir.1914); *In re Pinto Trucking Service, Inc.*, 93 B.R. 379, 388 (Bankr.E.D.Pa.1988); *In re Ipswich Bituminous Concrete Products, Inc.*, 79 B.R. 511, 517 (Bankr.D.Mass.1987); *In re Louisiana Industrial Coatings*, 31 B.R. 688, 698 (Bankr.E.D.La.1983); and *In re DeFeo Fruit Co., Inc.*, 24 B.R. 220, 225 (Bankr.W.D.Mo.1982). *Cf. Lytle v. Andrews*, 34 F.2d 252, 253–54 (8th Cir.1929) (Trustee could set aside a transfer of a debtor corporation's assets for its stock because the corporation had a creditor whose claim was unsatisfied). Given the grim financial condition of the Debtors at the time of the Termination Agreement,[2] we believe that the Debtors' stock had no value at that time. There was certainly no evidence presented which would indicate that, at this time, the Debtors' stock had any fair market value.

Our conclusion is further reinforced by the lack of showing that the Debtors benefitted in any way from the redemption of their stock. In addressing this issue, the First Circuit noted, in *Roco, supra*, 701 F.2d at 982, as follows:

In finding that the redemption of Consove's shares of Roco was a fraudulent transfer under section 548(a)(2), the bankruptcy court held that Roco received less than reasonably equivalent value for the $300,000 note and security interest it gave Consove. Indeed, Roco received nothing but all of its outstanding stock. We agree with the bankruptcy court that this stock was virtually worthless to Roco. Under generally accepted ac-

---

**2.** In fact, we conclude, at pages 620–624 *infra*, that the Debtors were insolvent at the time of the Agreement.

counting principles this treasury stock would be reported on the balance sheet of Roco as a reduction of stockholders' equity, not as an asset. *See generally R. Anthony & J. Reese, Accounting Principles* 215 (4th ed. 1979) ("Treasury stock is clearly not an 'economic resource' of an entity."). As the appellate panel noted, treasury stock is a form of shareholder distribution from which the corporation received no assets. When a corporation purchases treasury stock it reduces its capitalization. Thus, it would appear that, rather than benefitting the Debtors, the stock redemption meant nothing more than a reduction in the Debtors' equity. *Accord Ipswich, supra,* 79 B.R. at 517.

■ We agree with the *Roco* court that there may be instances where a stock redemption may constitute reasonably equivalent value.[3] For example, in the case of *In re Corporate Jet Aviation, Inc.,* 57 B.R. 195, 199 (Bankr.N.D.Ga.1986), *aff'd,* 82 B.R. 619 (N.D.Ga.1987), the court found that a redemption of stock was a reasonably equivalent exchange for a payment of $450,000.00 where it was accompanied by a waiver of the shareholders' right to dissent to a proposed sale of the Debtor. The court concluded, in that case, that the redemption and waiver significantly increased the amount realized from the sale of the Debtor there. *Id.* at 199. However, there is no comparable showing of any separate value or benefit to the Debtors as a result of the stock redemption here.

■ It is true that at the time of the stock redemption the Defendant also agreed to terminate his employment with the Debtors. However, according to the terms of the Termination Agreement, the $176,500 payment to the Defendant was the purchase price for his common stock. In addition, both the testimony of Stutts, the former chief financial officer of the Debtors, and the Financial Statements admitted into evidence clearly reflect the ten-uous financial situation of the Debtors at the time of the Termination Agreement. In light of the Debtors' financial woes, it is unclear what value, if any, can be assigned to the Defendant's rights under the employment contract.

It is particularly difficult to assess the value of the Defendant's claims under the employment contract without, as is the case here, having the terms of the contract admitted into the record in the case. This difficulty is compounded by the fact that none of the witnesses expressed any opinion regarding the value of the Defendant's rights under this contract. It may well be that the Defendant received more benefit from the termination of his employment contract than the Debtors did. As a result thereof, the Defendant was free to pursue other job and financial opportunities rather than continuing with the Debtors during their terminal financial decline.[4]

Our decision in *Pinto Trucking, supra,* cited by the Defendant in support of his position, is inapposite. There, the Trustee was seeking to avoid a settlement agreement entered into between two factions that had been fighting over control of the debtor. We concluded in that case that reasonably equivalent value was given in exchange for transfer of the debtor's stock to one of the factions. *Pinto Trucking, supra,* 93 B.R. at 390. However, there were a number of factors that contributed to this conclusion. First, the transfer in *Pinto Trucking* was pursuant to a settlement of a lawsuit that was clearly adversarial. Other lawsuits and claims existed between the parties. As a result, the settlement had obviously been negotiated at arms' length. In addition, all of the neutral participants, *i.e.,* the conservator and an accountant trusted by both factions whose assistance was enlisted by the conservator in effecting the settlement, recommended this resolution to all of the parties. Finally, the settlement was approved by a state court judge. There was no sugges-

---

3. The *Roco* court cites, for an example, the circumstance of a publicly-traded corporation that could redeem a fraction of its outstanding shares to "fund an executive benefits plan or to use in converting convertible bonds or preferred stocks." 701 F.2d at 982.

4. Of course, the Defendant would be under an obligation to mitigate any damages that might result for wrongful termination of his employment by seeking other employment.

tion of fraud or collusion in the settlement of the parties' disputes. It was only with these layers of assurances that the settlement agreement was totally fair, which are absent here, that we were willing to conclude there that the exchange of stock in connection with the settlement of the two factions' disputes constituted reasonably equivalent value.

The Defendant, as the Debtors' President and a shareholder, was clearly an insider at the time of the Termination Agreement. We believe that he must have been fully aware of the Debtors' declining financial circumstances. As a shareholder, the Defendant had a mere expectancy to recover dividends if the Debtors were profitable. By exchanging his stock for payment of money and a promissory note, he substantially improved his position vis-a-vis other shareholders. There is no suggestion that the negotiations which resulted in this Agreement were anything other than cordial. There was no evidence of the extreme personal animosity or extensive litigation between the parties which marked the negotiations of the settlement attacked in *Pinto Trucking*. We believe that we must carefully scrutinize the instant transaction to ensure that the Debtors received reasonably equivalent value. In so doing, we conclude that reasonably equivalent value was not received in the transaction.

In light of our conclusions that the Debtors' stock held no value at the time of the Termination Agreement and that the value of the Defendant's right to continued employment with the rapidly-declining Debtors was negligible, we conclude that the Debtors did not receive reasonably equivalent value in exchange for payments paid and promised to the Defendant.

2. THE TERMINATION AGREEMENT INVOLVED A TRANSFER OF PROPERTY AND THE UNDERTAKING OF AN OBLIGATION WHICH RENDERED THE DEBTORS INSOLVENT, OR, IN THE ALTERNATIVE, LEFT THEM WITH UNREASONABLY SMALL CAPITAL.

Having determined that the payments to the Defendant were not effected in exchange for reasonably equivalent value, it remains to be determined if the transaction left the Debtors insolvent or with unreasonably small capital so as to permit the transfers pursuant to this agreement to be set aside pursuant to 11 U.S.C. § 548(a)(2)(A) and (a)(2)(B)(i) or (a)(2)(B)(ii).

■ As we noted in *Pinto Trucking, supra*, 93 B.R. at 388, persuasive authority exists which "suggests that, if the creditor or party attacking a transfer as fraudulent meets the burden of proving inadequacy of consideration, the burden of defense of the transferee's [sic] solvency passes to the party seeking to uphold the transfer." *See United States v. Gleneagles Investment Co.*, 565 F.Supp. 556, 577 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Pinto*, 98 B.R. 200, 209 (Bankr.E.D.Pa. 1989); *In re Leinheiser*, 51 B.R. 164, 166 (Bankr.E.D.Pa.1985); *Baker v. Geist*, 457 Pa. 73, 78, 321 A.2d 634, 637 (1974); and *Farmers Trust Co. v. Bevis*, 331 Pa. 89, 91, 200 A. 54, 55 (1938). While it is true that most of the cited cases involved actions under the Pennsylvania Uniform Fraudulent Conveyance Act, 39 P.S. § 351, *et seq.* (hereinafter "the UFCA"), the present adversarial matter states alternative causes of action under the UFCA as well as under § 548, the fraudulent conveyance provisions of the Bankruptcy Code. It would, in our opinion, be irrational to require that the Trustee to bear the burden of proof on the issue of insolvency under § 548, while the transferee seeking to uphold the transaction would bear the burden of proving solvency under the UFCA. *Cf. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1298–99 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States*, 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987) (§ 548 of the Bankruptcy Code is modelled on the UFCA).

■ However, even if the Trustee were required to bear the burden of proof in the

present matter, we believe that he has established, at a minimum, that the Termination Agreement rendered the Debtors insolvent.

Insolvency is defined by the Bankruptcy Code as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation," exclusive of property exempted under § 522 of the Code or fraudulently transferred. 11 U.S.C. § 101(31); 2 COLLIER, *supra*, ¶ 101.31[1], at 101–74. The Code requires the use of a "balance sheet" test for insolvency, comparing assets to debts. *Pinto, supra,* 98 B.R. 200, 209; *In re Art Shirt Ltd.,* 68 B.R. 316, 322 (Bankr. E.D.Pa.1986), *aff'd,* 93 B.R. 333 (E.D.Pa. 1988); and *In re Corbett,* 80 B.R. 32, 37–38 (Bankr.E.D.Pa.1987).

■ The Termination Agreement was entered into on March 23, 1988. Since this is the date that JSD incurred its obligation to the Defendant, we must determine the Debtors' insolvency as of this date. *Compare Pinto, supra,* 98 B.R. at 209–210. We are aided in our determination by the Financial Statements prepared as of January 31, 1988, and admitted into evidence. *Compare Pinto, supra,* 98 B.R. at 211 (record of accounts payable on August 1, 1986, was relevant to determination of the Debtors' solvency on November 11, 1986). However, the Debtors' own balance sheets are not conclusive on the issue of insolvency. *Briden v. Foley,* 776 F.2d 379, 382 (1st Cir.1985); *Ipswich, supra,* 79 B.R. at 517; and *Art Shirt, supra,* 68 B.R. at 322. Values provided by documentary evidence should be adjusted in light of testimony presented. *See In re Ohio Corrugating Co.,* 91 B.R. 430, 437 (Bankr.N.D.Ohio 1988).

#### a. ASSETS

A "fair valuation" of the Debtors' assets requires that we "estimate ... what can be realized out of the assets within a reasonable time either through collection or sale at the regular market value" 2 COLLIER, *supra,* ¶ 101.31, at 101–86. *See Pinto, supra,* 98 B.R. at 210. In *Briden, supra,* 776

F.2d at 392, the First Circuit Court of Appeals indicated that

> [t]he balance sheet test focuses on the fair market value of the debtors' assets and liabilities within a reasonable time of the transfers. Asset valuation need not be exact. Assets should be reduced by the value of the assets not readily susceptible to liquidation and the payment of debts.

The Court in *In re Joe Flynn Rare Coins, Inc.,* 81 B.R. 1009, 1017 (Bankr.D.Kan. 1988), explained that

> [f]air valuation does not mean the amount the property would bring in the worst circumstances or the best ... For example, a forced sale price is not fair value though it may be used as evidence on the question of fair value ... The general idea of fair value is the amount of money the debtor could raise from its property in a short period of time, but not so short as to approximate a forced sale, if the debtor operated as a reasonably prudent businessman with his interests in mind, especially a proper concern for the payment of his debts.

*Accord, Ohio Corrugating, supra,* 91 B.R. at 436–38.

■ The Financial Statements show the Debtors' total assets to be $9,596,845 as of January 31, 1988. Inventory was valued at the lower of cost or market value, while property and equipment were valued at cost. The Trustee, however, challenges the accuracy of the values recited thereon for Merchandise and Supplies Inventory and for Property and Equipment. See Findings of Fact 23, 25, page 616 *supra.* We also question the accuracy of these amounts.

Merchandise and Supplies Inventory was assigned a combined value of $3,757,726 on the Financial Statements. However, the Debtors' inventory was sold to a liquidation firm, after "spirited bidding," Opinion I, 99 B.R. at 251, for $1,020,000. Lease improvements were valued at $3,016,799. While Jordan testified that the Debtors' leasehold improvements had no value independent of the Debtors' leasehold interests, the sales of the Debtors' leasehold inter-

ests, in a successful auction sale of the leases, *see id.* at 253, were sold for a gross price of $560,500 and resulted in a net income to the estate of only $410,000. Property and equipment removable and salable on site was sold for less than $35,000. Therefore, less than $600,000 gross and $450,000 net was realized for the Debtors' leases and improvements of the leased properties.

Per Jordan's testimony, the leasehold improvements were "not readily susceptible to liquidation and the payment of debts." *Compare Briden, supra,* 776 F.2d at 382. In addition, there was a large discrepancy between the value assigned for the leasehold improvements and even the gross amount realized by assignment of the Debtors' leasehold interests ($3,016,799 less $600,000 equals $2,416,799). There was also an unexplained increase of $1,345,855 in the value of the leasehold improvements between 1987 and 1988. See Finding of Fact 25, page 616 *supra.* Accordingly, we conclude that the $3,016,799 was not a "fair valuation" for the Debtors' leasehold interests. Rather, we believe that the amount realized for the assignment of the Debtors' leases and property contained therein more accurately reflected the fair market value of this asset. We shall therefore value this asset at $600,000, slightly more than the gross amount value realized by the Trustee for this asset.

■ We also believe that the large discrepancy between the value assigned to Merchandise and Supplies Inventory and the amount realized in the sale of these assets indicate an overvaluation of these accounts ($3,739,843 less $1,020,000 equals $2,719,843). However, it is clear that inventory, unlike leasehold improvements, could well have been depleted by sales. Furthermore, we do not believe that the amount received by sale of these assets through liquidation in the course of bankruptcy proceedings is the "fair valuation" of these assets. A liquidation sale in the context of a bankruptcy proceeding is more representative of a forced sale valuation than an amount that could be realized by the sale of assets within a reasonable time

by a going concern. Thus, while we feel that some reduction is appropriate for this asset, we reject the Trustee's suggestion that the sum realized in the sale of the Debtors' assets to the liquidator represents a fair valuation of these assets. In *Ohio Corrugating, supra,* 91 B.R. at 438, the court refused to discount inventory by any given percentage to reflect the amount that could have been realized from a public auction. The court there indicated that such a method of valuation "would unfairly assign a liquidation rather than a going concern value" to assets. We will therefore value the Debtors' inventory at $3,000,000, a figure somewhat but not greatly reduced from that on the Financial Statements.

### b. LIABILITIES

■ We turn now to the liability side of the ledger sheet. We address herein mainly the Trustee's contention that the redemption value of Class A and Class B stock must be considered as a debt in determining insolvency. A "debt" is defined by the Code as "liability on a claim." 11 U.S.C. § 101(11). A "claim," is defined as follows in 11 U.S.C. § 101(4):

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment whether or not such right to any equitable remedy is reduced to a judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

The Trustee maintains that the "mandatorily redeemable preferred" Class A and Class B shares of stock have many of the characteristics of a debt and that the redemption price for this stock should be counted as a debt on the Debtor's insolvency balance sheet. We disagree for a number of reasons.

■ First, the Trustee seems to suggest that the stockholders' dividends and

their liquidation and redemption values are fixed liabilities. However, the rights of shareholders to recover dividends or to redeem their stock is dependent on the financial solvency of a corporation. *See Corporate Jet Aviation, supra,* 57 B.R. at 199. State law prohibits the redemption of shareholder stock by a corporation that is insolvent. 15 P.S. § 1701 B(4). A redemption of stock made while a company is insolvent may be avoided as a fraudulent or preferential transfer. See pages 618–20 *supra* and cases cited at page 618 *supra.* Moreover, it is clear from analysis of the terms of the Certificate in issue here that shareholder-liquidation interests in the Debtors were dependent on the presence of sufficient assets to permit liquidation payments. While the Certificate provides for the redemption of Class A and Class B stock, this redemption is not "mandatory." Indeed, the Certificate provides that, if the Debtors fails to redeem the stock "for any reason or for no reason," the price of converting preferred stock to common stock will be reduced.

Similarly, the redemption of preferred stock allowable here is dependent upon the Debtors' having sufficient assets to redeem it. Stockholders, as owners of an enterprise, bear the risk of a company's financial failing and, conversely, receive the benefits of success. *Cf. In re Comtec Industries, Inc.,* 91 B.R. 344, 348 (Bankr.E.D.Pa.1988). Their interest in a corporation is a residual interest, measured by the difference between the assets and the liabilities of a corporation. FINANCIAL ACCOUNTING SERVICES BOARD, CONCEPTUAL FRAMEWORK FOR FINANCIAL ACCOUNTING AND REPORTING: ELEMENTS OF FINANCIAL STATEMENTS AND THEIR MEASUREMENT 90–92 (1976).

The Trustee argues that the shareholders' redemption rights constitute a "claim" or "debt" under the Bankruptcy Code. However, the Code specifically provides that an equity security holder may file a proof of *interest* in a case, while a "creditor" files a proof of claim. 11 U.S.C. § 501(a). Equity security holders do not receive distribution until after a debtor's creditors have been satisfied. *See Louisiana Industrial Coatings, supra,* 31 B.R. at 697. Thus, we do not believe, at least on the basis of the present record, that the redemption rights of preferred stockholders of the Debtors here can be properly characterized as debts.

The Trustee cites to a federal Security and Exchange Commission (hereinafter "SEC") Regulation which prohibits classification of redeemable preferred stock as "stockholders' equity." 17 C.F.R. § 210.5–02.28. However, it appears conceded that this SEC Regulation was not applicable to the Debtors, since they were not publicly held companies. Even if SEC regulations did apply, Jordan testified that mandatorily redeemable stock should be classified "somewhere between" liabilities and shareholder equity, not as a corporate liability.

In addition, Jordan noted that it was the Debtors themselves and not Peat who classified the Debtors' redeemable stock as stockholders' equity rather than as a liability. Jordan further testified that such a classification fell within the guidelines of GAAP.[5] While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a

---

**5.** An accounting text states the following regarding balance sheet recording of redeemable preferred stock for corporations not held publicly: *Debt Characteristics of Preferred Stock.* With the right combination of features (i.e., fixed return, no vote, redeemable), a preferred stockholder may possess more of the characteristics of a creditor than of an owner. Preferred shares generally have no maturity date, but the preferred stockholder's relationship with the company may be terminated if the corporation exercises its call privilege. Despite these creditorship characteristics, preferred stock is usually accounted for as an equity security and is reported in the stockholders' equity section of the balance sheet. . . .

At present GAAP does not distinguish between redeemable preferred stock and other classes of capital stock for balance sheet reporting purposes. The redemption features of such stocks are usually disclosed in footnotes to the financial statements.
D. KEISO & J. WEYGANDT, INTERMEDIATE ACCOUNTING 651–652 (3rd ed. 1980).

company's treatment of its assets and liabilities according to GAAP. *Accord, Ohio Corrugating, supra,* 91 B.R. at 438. A contrary result would penalize persons relying upon GAAP in assessing the solvency of the Debtors. *See id.*

Unlike withdrawal liability under the Employment Retirement Income Security Act, 29 U.S.C. § 1381, *et seq.* (hereinafter "ERISA"), which we considered in *Art Shirt, supra,* a shareholder's right to redemption is not a fixed or definite liability. Stock redemption rights are contingent upon the financial health of a company. In contrast, ERISA requires that employee pension plans provide vested benefits to employees after a designated period. *In re Art Shirt Ltd.,* 93 B.R. 333, 337 (E.D.Pa. 1988). Withdrawal liability is a fixed amount for which a financially-troubled employer remains liable to a pension fund. 29 U.S.C. § 1381(a). *See In re Garafano,* 99 B.R. 624, 631 (Bankr.E.D.Pa.1989); *Art Shirt, supra,* 93 B.R. at 337–38; and *In re T.D.M.A., Inc.,* 66 B.R. 992, 993 (Bankr. E.D.Pa.1986).

We therefore conclude that the redemption value of the Debtors' "mandatorily" redeemable stock should not be considered as a liability of the Debtors. Consequently, we conclude that none of the $2,497,-616.00 set forth on the Consolidated Balance Sheets of January 1, 1988, see Finding of Fact 26, page 617 *supra,* should be included within the Debtors' liabilities. However, the $7,099,229.00 of liabilities stated on the Consolidated Balance Sheets remains. As we indicate at page 624 *infra,* this figure is sufficient to exceed the Debtors' assets and nevertheless render the Debtors insolvent under the "bankruptcy test" for same.

### c. ADJUSTED BALANCE SHEET

The asset side of the Debtors' balance sheet, as of January 31, 1988, when adjusted in light of our discussion at pages 621–22 *supra,* can be stated as follows:

ASSETS

| | |
|---|---|
| Current Assets: | |
| Cash and cash equivalents | $2,186,200 |
| Trade and other miscellaneous receivables | 78,134 |
| Merchandise inventory | 3,000,000 |
| Supplies inventory | 17,882 |
| Other current assets | 71,538 |
| Total current assets | $5,353,754[6] |
| | |
| Property and Equipment: | |
| Machinery and equipment | $ 239,281 |
| Leasehold improvements | 600,000 |
| Trucks | 10,759 |
| Furniture and fixtures | 779,686 |
| Construction in progress | 6,969 |
| | $1,636,695[7] |
| Less accumulated depreciation and amortization | 589,512 |
| Net property and equipment | $6,400,937 |

When the Debtors' total assets ($6,400,-937) are compared to the total liabilities listed in the Financial Statements ($7,099,-229), see page 624 *supra,* it becomes clear that the Debtors were insolvent on January 31, 1988. Between this date and March 23, 1988, the Debtors suffered approximately $600,000 in losses. During this period, the Debtors were unable to pay their bills as they fell due and incurred further liabilities to meet their necessary financial obligations. Thus, we can easily conclude that the Debtors continued to be insolvent on March 23, 1988. *See Ipswich, supra,* 79 B.R. at 517 (testimony established that financial condition of debtor did not materially improve between date of financial statement and date of transfer). Even if the Debtors were not insolvent prior to entering into the Termination Agreement, they were clearly rendered insolvent when they incurred the additional $176,500 liability to the Defendant in that Agreement.

3. THE TRUSTEE IS ENTITLED TO AVOID THE TRANSFERS MADE BY THE DEBTORS PURSUANT TO THE TERMINATION AGREEMENT UNDER 11 U.S.C. § 548(a)(2).

■ As noted at pages 617–18 *supra,* a transfer or obligation may be avoided by a

---

**6.** All figures except "Merchandise inventory" are taken from the Consolidated Balance Sheets. We are unclear why "Property and Equipment" is separated from other "current assets," but we have retained this mode of presentation herein.

**7.** All figures on this portion of the Consolidated Financial Statement are left intact except "Leasehold Improvements," which we reduced to $600,000 from $3,016,799, per our discussion at pages 621–22 *supra.*

trustee under § 548 if the debtors received less than fair consideration and the transfer or obligation rendered debtor insolvent. 11 U.S.C. § 548(a)(2)(A) and (a)(2)(B)(i). This basis for avoidance of the Agreement and all of the transfers pursuant to it is sufficient to provide the Trustee all of the relief which he seeks, *i.e.*, avoidance of all of the payments to the Defendant under the Termination Agreement, totalling $94,500. However, we briefly note hereafter the viability of several of the Trustee's alternative theories.

 First, we note that the Trustee's recovery may be based upon a showing of a transfer for less than fair consideration which leaves a debtor with unreasonably small capital to continue their business. 11 U.S.C. §§ 548(a)(2)(A) and 548(a)(2)(B)(ii). As was shown from particularly the testimony of Stutts, Findings of Fact 15–18, page 616 *supra*, the Debtors' financial position was precarious at the end of January, 1988. They incurred substantial debt after that time. They were unable to meet their financial obligations as they became due and incurred further financial obligations to meet these obligations. The Termination Agreement placed upon the Debtors an additional $176,500.00 of debt. The Financial Statements indicate an accumulated deficit in stockholders' equity in the amount of $4,168,285.00. Finding of Fact 17, page 616 *supra*. Redemption of the Debtors' stock, as contemplated by the Certificate, Findings of Fact 9–14, page 615 *supra*, would further reduce the Debtors' capitalization in the future. *See Roco, supra*, 701 F.2d at 982 (under GAAP, a redemption of treasury shares should be reported as a reduction of stockholders equity, as it reduces a company's capitalization). Redemption of the Defendant's stock by the Debtors here had the same effect.

We therefore conclude that the payments and promissory note given to the Defendant left the Debtors with insufficient capital to continue business. Accordingly, we hold that both the payments and promissory note may be avoided as fraudulent transfers under 11 U.S.C. §§ 548(a)(2)(A) and 548(a)(2)(B)(ii) as well.

### 4. THE PAYMENTS AND PROMISSORY NOTE GIVEN TO THE DEFENDANT MAY ALSO BE AVOIDED UNDER THE PENNSYLVANIA UFCA.

 The Trustee here also seeks to proceed, through use of 11 U.S.C. § 544(a),[8] to avoid the payments to the Defendant under the UFCA. Chief Judge Twardowski of this court previously concluded, in *In re Leinheiser*, 51 B.R. 164, 165 (Bankr.E.D. Pa.1985), that the Pennsylvania UFCA, like § 548, allows for the avoidance of

> [e]very conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without fair consideration.

39 P.S. §§ 354, 359.

Insolvency under the UFCA is defined as follows:

> A person is insolvent when the present, fair, salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

39 P.S. § 352(1). *See Tabor Court, supra*, 803 F.2d at 1303; and *In re Fleet*, 89 B.R. 420, 425 (E.D.Pa.1988) (applying identical New Jersey version of UFCA). The Pennsylvania Supreme Court has noted as follows:

> A reasonable construction of the ... statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense, i.e., a deficit net worth, but also included a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature.

---

**8.** 11 U.S.C. § 544 empowers the Trustee to avoid any transfer of property of the debtor or any obligation incurred by the debtor that could be avoided by creditors as a fraudulent transfer under state law. *See, e.g., In re Frascatore*, 98 B.R. 710, 716 (Bankr.E.D.Pa.1989).

*Larrimer v. Feeney,* 411 Pa. 604, 608, 192 A.2d 351, 353 (1963). Thus, we noted in *Fleet, supra,* 89 B.R. at 425, that this common law test for insolvency was not a difficult test to meet. In addition, as we have previously discussed, once the Trustee has established that a conveyance is made or an obligation is incurred without fair consideration, the burden then shifts to the transferee to establish the Debtors' solvency under the UFCA. See page 620 *supra,* and cases cited therein.

It has already been established that the Debtors met the Bankruptcy Code insolvency test. See page 624 *supra.* It therefore follows as of course that they meet the easier, common law insolvency test. *See Fleet, supra,* 89 B.R. at 424. Furthermore, it is clear from the testimony presented that the Debtors were unable to meet their financial obligations as they fell due. Thus, we do not hesitate in concluding that the March 23, 1988, transaction with the Defendant also violated the Pennsylvania UFCA and that transfers by the Debtors pursuant thereto may be avoided under 11 U.S.C. § 544.

5. THE TRUSTEE MAY AVOID PAYMENTS MADE TO THE DEFENDANT WITHIN NINETY (90) DAYS OF THE FILING OF THE DEBTORS' BANKRUPTCY PETITION AS PREFERENTIAL PAYMENTS.

■■■ The Trustee is also entitled to recover payments made by it to the Defendant within ninety (90) days of the Debtors' bankruptcy filing as preferential payments. 11 U.S.C. § 547(b) provides that a trustee may avoid the transfer of an interest in property

(1) to or for the benefit of a creditor;
(2) to or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;

(4) made—
 (A) on or within 90 days before the date of the filing of the petition; ... [9]
(5) that enables the creditor to receive more than such creditor would receive if—
 (A) the case were a case under Chapter 7 of this title;
 (B) the transfer had not been made; and
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Our previous conclusion that the Debtors were insolvent is bolstered in this context by 11 U.S.C. § 547(f), which provides that, for the purposes of the preference section, the debtor is presumed to have been insolvent on and during the ninety (90) days immediately preceding the date of the filing of the petition.

■■■ It is undisputed that the Defendant received $24,000 in payments within the 90–day preference period. However, the Defendant maintains that the check issued on August 19, 1988, and cashed on August 24, 1988, see Finding of Fact 22, page 616 *supra,* was not within the 90–day period.

The Debtors' petitions were filed on November 21, 1988. Ninety (90) days prior to that date was August 23, 1988. The Defendant maintains that, pursuant to this court's holding in *In re American International Airways, Inc.,* 68 B.R. 326 (Bankr.E.D.Pa.1986), *aff'd,* C.A. No. 87–1287, 1987 WL 54484 (E.D.Pa. April 12, 1987) (hereinafter "*AIA*"), the August 19, 1988, check payment was not preferential since it was delivered prior to the 90–day period.[10] The Defendant's citation to *AIA,* however, is inaccurate. In *AIA* we addressed whether the date of honor or the date of delivery was the relevant date for determining whether a payment was made within the preference period for the purposes of

---

**9.** 11 U.S.C. § 547(b)(4)(B), extending the preference period to one year for parties who were insiders of a debtor *at the time of the transfers,* is not relevant here, because the Defendant had terminated his insider status with the Debtors simultaneously with the initial transfer.

**10.** In fact, there does not appear to be any evidence in the record as to when this check was *delivered* as opposed to when it was issued.

§ 547(c)(2).[11] Indeed, we expressly recognized that the different policies behind § 547(b) and § 547(c)(2) and concluded that, while the date of delivery of a check was the relevant date for purposes of § 547(c)(2), the date a check was honored was the relevant date for purposes of § 547(b). *AIA*, 68 B.R. at 333–36. *See, e.g.,* Comment, *Timing of Payments By Check Under § 547 of the Bankruptcy Code,* 7 CARDOZO L.REV. 887, 902–03 (1986). Thus, we have no difficulty concluding here that the August payment fell within the preference period, since the check was honored within ninety (90) days of the filing of the petition. *Accord, e.g., In re Fasano/Harriss Pie Co.,* 43 B.R. 871, 873–74 (Bankr.W.D.Mich.1984); and *In re Ardmore Sales Co.,* 22 B.R. 911, 913 (Bankr.E.D.Pa.1982).

Hence, the Trustee is alternatively entitled to recover $24,000 of the amount in issue under 11 U.S.C. § 547.

### 6. REDEMPTION OF DEBTORS' STOCK WAS PROHIBITED BY PENNSYLVANIA BUSINESS CORPORATION LAW, THUS ALSO JUSTIFYING THE TRUSTEE'S RECOVERY.

 In addition to the above-mentioned limitations on fraudulent and preferential transfers, the Pennsylvania Business Corporation Law prohibits the redemption of corporate stock when a corporation is insolvent or otherwise lacks sufficient financial resources. The relevant section of the Pennsylvania Business Corporation Law provides that a corporation may only purchase shares of its own stock:[12]

(4) When it is not insolvent and would not by such purchase or redemption be rendered insolvent, and

(5) When such purchase or redemption would not reduce the remaining net assets of the corporation below the aggregate preferential amount payable in the event of voluntary liquidation to the holders of shares having rights to the assets of the corporation in the event of liquidation prior to or equal to the rights of the holders of the shares redeemed or purchased.

15 P.S. § 1701B(4), (5).[13] The Trustee maintains that the Debtors' transfer did not meet the criteria of either § 1701 B(4) or 1701 B(5).

Insolvency under the Pennsylvania Corporation Law is defined as the "inability of a corporation to pay its debts as they become due in the usual course of its business." 15 P.S. § 1002(9). As noted previously, Stutts testified extensively regarding the declining financial status of the Debtors, including their inability to meet financial obligations as they fell due. See Finding of Fact 15, page 616 *supra.* We therefore hold that the criterion of 15 P.S. § 1701 B(4) has been met here.

 The Trustee also maintains that the payment of $176,500.00 to Boyle for his 500,000 shares of the Debtors' common stock depleted the assets of the Debtors below the aggregate preferential amount payable in the event of a voluntary liquidation. In the event of voluntary liquidation, holders of Class B stock were entitled to an aggregate preference payment of $2.36 per share and holders of Class A stock were entitled to payment of $6.79 per share. This means that, in order to redeem common stock, the Debtors should have

---

**11.** Section 547(c)(2) will allow an otherwise preferential transfer to remain intact if it was made in payment of a debt incurred by the debtor in the ordinary course of business.

**12.** We do not agree with the Defendant's suggesting that we are dealing with a situation whereby one corporation is purchasing the stock of another here. While payments to the Defendant may have been made by JSP, the Agreement to repurchase the Defendant's stock in JSD was entered into between the Defendant

and JSD. Payments were made by JSP simply because JSP was a wholly-owned subsidiary of JSD and made all payments for the Debtors.

**13.** While 15 P.S. § 1701 B was repealed by the enactment of the Association's Code, Section 302 of the Act of December 21, 1988, P.L. 1444, No. 177, and will be replaced by 25 Pa.C.S. § 1551(b), this repeal is not effective until October 1, 1989. Hence, the provisions of 15 P.S. § 1701 B control this controversy.

**628**

had net assets equal to at least $6,607,-146.32.[14] As seen from our discussion at pages 621–22 *supra,* there were no net operating assets that would have been available to make these payments. The total stockholders' equity of the Debtors as of January 31, 1989, was only $2,497,-616.00, see Finding of Fact 26, page 617 *supra,* not nearly enough to pay the aggregate preference payments that would be due in the event of the Debtors' voluntary liquidation. Thus, the Debtors' re-purchase of the Defendant's common stock was in violation of 15 P.S. § 1701 B(5) as well, and the transaction could have also been avoided on that ground.

### E. CONCLUSION

We have previously concluded that the Debtors' payments and promissory note given to the Defendant in exchange for his shares of common stock may be avoided as fraudulent transfers under both the Bankruptcy Code and the UFCA. In addition, the purchase of the Defendant's common stock occurred while the Debtors were insolvent and did not leave the Debtors with sufficient net assets for them to have paid the aggregate preferential payments required to be made to holders of preferred stock in the event of voluntary liquidation, thus violating the Pennsylvania Business Corporation Law. Finally, we conclude that certain of the payments made to the Defendant within the preferential payment period may also be avoided under § 547 of the Bankruptcy Code. Accordingly, we shall allow the Trustee to avoid the obligation incurred by the Debtors under the terms of the Termination Agreement, and to recover all of the payments made to the Defendant pursuant to that Agreement. An appropriate order will be entered.

14. 
| | 1,909,780 | outstanding shares of Class B stock |
| × | $2.36 | per share |
| | $4,507,080.80 | |

| | 309,288 | outstanding shares of Class A stock |
| × | $6.79 | per share |
| | $2,100,065.52 | |

### ORDER

AND NOW, this 3rd day of August, 1989, upon consideration of the Stipulation of Facts submitted by the parties and the evidence presented at the trial held in this matter on May 24, 1989, and the Post-trial Memoranda submitted by the parties in this matter, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtors' Trustee, MELVIN LASHNER, ESQUIRE, and against the Defendant, GREGORY BOYLE, in the amount of $94,-500.00.

2. The Termination Agreement and Promissory Note entered into between the Defendant and JOSHUA SLOCUM, LTD., a Delaware Corporation, on March 23, 1988, are hereby rescinded and declared to be void and of no legal effect.

| $4,507,080.80 | - | preference payments for Class B stock |
| + 2,100,065.52 | - | preference payments for Class A stock |
| $6,607,146.32 | - | aggregate preferential payment in event of voluntary liquidation |